**David HANSEN, Plaintiff–Appellant,**

**v.**

**SKYWEST AIRLINES, Defendant–Appellee.**

United States Equal Employment Opportunity Commission, Amicus Curiae.

No. 15-8112

United States Court of Appeals, Tenth Circuit.

Filed December 21, 2016

Jeffrey C. Gosman of Gosman Law Office, Casper, Wyoming, for Plaintiff-Appellant.

Chad A. Shultz (Leslie K. Eason and Julia C. Glasgow with him on the briefs), of Gordon & Rees, Atlanta, Georgia, for Defendant-Appellee.

Philip M. Kovnat, Attorney (P. David Lopez, General Counsel; Jennifer S. Goldstein, Associate General Counsel; Lorraine C. Davis, Assistant General Counsel; Elizabeth E. Theran, Attorney, with him on the briefs), Equal Employment Opportunity Commission Office of General Counsel, Washington, D.C., filed an amicus curiae brief for the United States Equal Employment Opportunity Commission.

Before BRISCOE, McKAY, and MATHESON, Circuit Judges.

McKAY, Circuit Judge.

Plaintiff David Hansen filed this suit against his former employer, Defendant SkyWest Airlines, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17, for sex-based hostile work environment, disparate treatment, quid pro quo harassment, coworker harassment, retaliation, and for intentional infliction of emotional distress under state law. The district court granted summary judgment for SkyWest with respect to all of his claims. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse in part and remand for further proceedings consistent with this opinion. We affirm the district court's grant of summary judgment on the disparate treatment claim, which Mr. Hansen did not contest on appeal.

**FACTS**

Mr. Hansen worked for Defendant SkyWest Airlines from 2003 until 2011, when he was fired. Mr. Hansen is gay. He claims he was sexually harassed by several of his supervisors and coworkers over the eight years he worked for SkyWest. Mr. Hansen and SkyWest hotly dispute the facts surrounding his time at SkyWest but, because the case was resolved against him on summary judgment, we present the facts in the light most favorable to Mr. Hansen.[1]

Mr. Hansen spent his first four years with SkyWest as a customer-service agent at the Salt Lake City International Airport before transferring to the Jackson Hole Airport in Wyoming in December 2007. According to Mr. Hansen, the sexual harassment began in Salt Lake. Mr. Hansen alleges that "even early in [his] career at SkyWest" he had "supervisors and others" proposition him for sex and "touch[ ] [him] in ways that were extremely unwelcome."[2] A435. Although there is not much factual detail for this four-year span, there is at least one specific incident of sexual harassment in the record: Mr. Hansen testified in a deposition that in 2004 a supervisor, Brian Johansen, who is also gay, "pushed himself against" Mr. Hansen and "comment[ed] about [his] smell," and then "followed up with an e-mail." A341–42. Mr. Hansen did not recall what more was said, but he maintained that "it was sexual in nature and there was no doubting it was sexual in nature." *Id.*

At some point in 2004, Mr. Hansen's psychotherapist wrote an undated letter

---

1. Some of the following narrative derives from Mr. Hansen's declaration. After thoroughly reviewing the record and the declaration, we disagree with SkyWest that the declaration is overly conclusory, unsupported, or contradicted by the record. Nor is the declaration defective simply because it is unsworn. *See* 28 U.S.C. § 1746.

2. We cite the Appendix contents as "A" followed by the page number.

"to whom it may concern" about Mr. Hansen's psychological wellbeing. According to this letter, Mr. Hansen presented with symptoms of Post-Traumatic Stress Disorder (PTSD). The letter warned that Mr. Hansen's "condition could be triggered by employment issues such as discrimination, conflict, and a sense that he is being taken advantage of." A400. Mr. Hansen delivered this letter to SkyWest's human-resources department, and both Mr. Hansen and his therapist met with SkyWest's human-resources department in Salt Lake City several times over the next "three or four years" to inform them that "any sexual touching or other sexual misconduct" might trigger his "PTSD like symptoms." A436. Later, Mr. Hansen requested accommodations for his PTSD under the Family and Medical Leave Act, which SkyWest provided; Mr. Hansen could take a "timeout" at work when he felt threatened or was under considerable stress.

In December of 2007, Mr. Hansen transferred from Salt Lake to SkyWest's Jackson, Wyoming, station where he worked as a "ticket counter/gate agent." A436. According to Mr. Hansen, his coworker, John Robinson, and their supervisor, Lynn Katoa, both of whom are gay, began sexually harassing him soon after he transferred. Mr. Robinson and Mr. Katoa were also dating. Mr. Hansen claims Mr. Robinson "began to rub against [him] with his genitals" at work. A436. Mr. Hansen testified in his deposition that Mr. Robinson rubbed himself against Mr. Hansen several times and that, on one particular occasion, Mr. Robinson declared, "I love it when Lynn [Katoa] gives it to me hard." A321. Mr. Hansen also alleges that Mr. Katoa similarly rubbed his genitals across Mr. Hansen's back and asked, "Oops. Did that get you excited?" A311.

In April 2008, Mr. Hansen, Mr. Katoa, and Mr. Robinson were scheduled to travel to Denver to attend training. Mr. Katoa was responsible for arranging accommodations; he booked one room for the three men to share. Mr. Hansen told the Jackson station manager he was uncomfortable sharing a room with Mr. Katoa and Mr. Robinson, and Mr. Hansen was permitted to have his own room. (Mr. Hansen also reported to the station manager that Mr. Robinson and Mr. Katoa were touching him in ways that he found unwelcome and had engaged him in unwelcome "sex talk." A552.) Apparently, this arrangement upset Mr. Katoa, who complained to the station manager. Mr. Katoa and Mr. Robinson later "pushed" Mr. Hansen "into the corner of the supervisor's office," and demanded to know, "Why won't you stay with us in the hotel room in Denver? I don't understand it. There's a problem. Why did you request a special accommodations not to stay in the hotel room with us? Are you afraid?" A315–16; A311–12.

Sometime in the spring of 2008, Mr. Robinson was promoted and became Mr. Hansen's supervisor. After he was promoted, Mr. Robinson "made it very clear" that Mr. Hansen had to "suck his dick" or Mr. Hansen would be out of a job. A339–40. Mr. Hansen claims that Mr. Robinson said: "If you suck my dick, like I do Lynn Katoa's, then you'll be promoted to a supervisor or higher just like I was. That's how I made this position." A297. According to Mr. Hansen, Mr. Katoa had also alluded to Mr. Robinson's promotion as a reward for performing sexual favors for Mr. Katoa.

Mr. Hansen further alleges that Mr. Robinson and Mr. Katoa harassed him several more times during the spring of 2008, including some demonstrations of hostility for reporting sexual misconduct in the workplace. Sometime around May 2008, Mr. Katoa pressed his shoulder against Mr. Hansen's shoulder and said, "I under-

stand that you've lodged a complaint with [the station manager] that I made you feel uncomfortable. What about this makes you feel uncomfortable?" A312. Later that month, Mr. Katoa again questioned Mr. Hansen about a complaint he had filed: he put his hand on Mr. Hansen's back and said, "I'm upset. I've understood that you filed a grievance against [another employee] for her showing another supervisor's penis on the phone. Why would you do that? Why don't you just join us?" A313. Later, Mr. Robinson, in reference to the same grievance, pushed Mr. Hansen and said, "I know you were the one who filed the grievance.... You need to get along with us here and you need to let this roll off your back." A322.

A few months later, in the summer of 2008, Mr. Robinson asked Mr. Hansen, "Doesn't my butt look good?" and pretended to fall onto Mr. Hansen. A322–23. Mr. Hansen claims he told Mr. Robinson he felt uncomfortable and attempted to walk away, but that Mr. Robinson followed him and asked: "Why are you not helping us to push the gay agenda? ... You are gay. Why are you not going along with this?" A323. Mr. Hansen was "very upset" over this incident and he left to speak with a supervisor. *Id.* When Mr. Hansen returned, Mr. Robinson said, "[The station manager]'s gonna be gone, and they're gonna promote me because I'm doing exactly what I do, and that is provide—or get along with them. Do these things, and just watch." *Id.*

In November 2008, Mr. Hansen returned home to Salt Lake City for Thanksgiving. There, Mr. Johansen, a SkyWest supervisor for Salt Lake, forced himself onto Mr. Hansen and tried to push Mr. Hansen to the ground. According to Mr. Hansen's deposition, Mr. Johansen tried to lay on top of Mr. Hansen, and said, "Down bitch." A333. In January 2009, Mr. Hansen

alleges he was sexually harassed by Mr. Robinson and Mr. Katoa at the SkyWest Christmas party. Mr. Robinson and Mr. Katoa, who were both inebriated, invited Mr. Hansen to join them skinny-dipping in a hot tub. Mr. Hansen claims that Mr. Robinson grabbed him and insisted, "You've got to come to the hot tub with us. You got to get in naked. You got to come to the hot tub." A328.

In April 2009, Mr. Robinson again rubbed his genitals against Mr. Hansen's lower body—this time, in front of multiple witnesses. One witness testified in a deposition that she saw "John Robinson rubbing his front up against [Mr. Hansen's] back... [a]t the ticket counter." A619. Another witness recounted seeing Mr. Robinson "c[o]me up behind" Mr. Hansen and "rub[ ].... [h]is unit, junk, whatever you want to call it," up against Mr. Hansen's "butt." A681. Mr. Hansen also claims Mr. Robinson stalked him around the workplace and, at one point, shoved Mr. Hansen into an unoccupied office and insisted that Mr. Hansen was "going to take his advances at that time." A328. Mr. Hansen rejected Mr. Robinson and pushed past him to escape.

On April 17, 2009, Mr. Hansen reported Mr. Robinson and Mr. Katoa to Danny Luton, the new station manager. According to a witness, Mr. Luton "started to get verbally abusive" and asserted that Mr. Hansen was making it all up. A523. He told Mr. Hansen that if "he was to write any grievances or say anything about the situation that he would make sure that [Mr. Hansen] had no job and that [SkyWest headquarters] would never see those grievances." *Id.*

Mr. Hansen also reported to an HR official at SkyWest that he "had been sexually harassed and badgered by Robinson." A737. Mr. Hansen's complaint led to a meeting with two managers, Mr. Luton

and David Hyllested, to discuss the April incidents. According to Mr. Hansen, Mr. Luton threatened to "fire [Mr. Hansen] on the spot," or "paper up [his] file until he could fire [him]," and that he "would sue [Mr. Hansen] if [he] didn't drop the complaint." A737. No corrective action was taken to address the alleged sexual harassment. Instead, Mr. Hansen was informed that *he* was under investigation for shoving another coworker. Mr. Hansen also learned that Mr. Robinson had reported Mr. Hansen for pushing him too. Mr. Hansen was sent home and not allowed to return to work until June 18, 2009.

Soon after Mr. Hansen returned to work, he submitted an intake questionnaire to the Wyoming Fair Employment Program (FEP), in which he complained about workplace sex discrimination and disability discrimination. According to Mr. Hansen, he was told by an employee of the Wyoming FEP that he "could not file a charge of discrimination based on sex because it was a sexual orientation claim." A445. Based on this, Mr. Hansen filed a charge on June 26, 2009, with the Wyoming FEP alleging that from August 2007 through April 2009 he had experienced discrimination based on age and disability and that he was retaliated against for engaging in protected activity; the charge did not reference sexual harassment.

In October 2009, four months after Mr. Hansen filed this charge, Mr. Robinson transferred to Seattle. As the district court explained, Mr. Robinson "left Jackson because he and Lynn Katoa were no longer dating and he was still in love with Katoa and wanted to continue dating." A746. It appears from the record that Mr. Hansen did not experience sexual harassment while Mr. Robinson was in Seattle. But the harassment then resumed when Mr. Robinson returned to Jackson around June of 2010. According to Mr. Hansen, he voiced his concerns to SkyWest human resources and the Jackson station manager about Mr. Robinson's return. Those concerns, apparently, went unaddressed, and Mr. Robinson was made Mr. Hansen's "direct supervisor" in the fall. A450. Specifically, Mr. Hansen alleges that in October 2010, Mr. Robinson rubbed himself against Mr. Hansen in front of airline passengers and said, "I heard you bought a new home here. I would really like to come over and see your bedroom." A759.

According to Mr. Hansen, he again voiced his concerns about Mr. Robinson to Mr. Hyllested, the new station manager. He also reminded Mr. Hyllested that he had a pending grievance against Mr. Robinson that had not been fully resolved. Mr. Hyllested told Mr. Hansen he thought Mr. Hansen was making it all up and that he did not want to hear about it. When Mr. Hyllested failed to address the situation, Mr. Hansen tried to escape Mr. Robinson by transferring to a different assignment in a different part of the airport, known as the "ramp area." A450. But, Mr. Hansen could not avoid lewd talk. Mr. Hansen claims his coworkers at the ramp area "subjected [him] to explicit sexual commentary on a daily basis." A450. In particular, Mr. Hansen asserts that his "coworkers engaged in discussions involving men and women having sex and defecating on each other during the sex act." A450. When he reported this lewd commentary to Mr. Hyllested, Mr. Hyllested responded: "I am not worried about what you report about them, I am worried about what they report about you. You need to quit worrying about them and get back to work." A450. Around this same time, Mr. Katoa approached Mr. Hansen about a gym membership at a local gym, and he remarked to Mr. Hansen that he could "sexually be aggressive" or "sexually harass" Mr. Hansen there "since it wasn't work." A760. Mr. Hansen has also alleged

a female supervisor told him that if he did not "pick up [her] supervisory shift," she would "add to [his] sexual harassment problems." A760–61. According to Mr. Hansen, he renewed his request for accommodations, specifically stating that his PTSD was triggered by recent incidents of sexual harassment.

In January 2011, Mr. Hansen got involved in an argument with a coworker over changing tickets for passengers. This led to a heated exchange and SkyWest ultimately terminated Mr. Hansen's employment. The events leading up to Mr. Hansen's termination were investigated by SkyWest officials, including Mr. Katoa. Mr. Hansen claims that, during the investigation, Mr. Katoa cornered Mr. Hansen, "rubbed his clothed genitals against him," and "asked if he was afraid he was harassing Hansen." A749. Mr. Hansen further alleges the investigation was inadequate. He claims the investigators, including Mr. Katoa, failed to interview witnesses who could have testified to Mr. Hansen's version of events. Because, in Mr. Hansen's opinion, the investigation was biased, he asked one witness to email a statement detailing the events surrounding his termination, which she did; Mr. Hansen then forwarded it on to SkyWest. Mr. Hansen has also maintained that other demerits on his personnel record were fabricated by his coworkers and by management.

After appealing his termination through SkyWest's internal grievance process to no avail, he filed a second charge of discrimination to the Wyoming FEP in August 2011, claiming sex discrimination and retaliation under Title VII and Wyoming law. He alleged, among other things, that he was subjected to "unwelcome sexual harassment" by his "supervisor, John Robinson" from May 1, 2008, to February 11, 2011, and that "[t]he acceptance or rejection of the harassment ... was an ex-press[ ] or implied condition to the receipt of a job benefit or cause [of] a tangible job detriment." A753. After he filed this second charge, he withdrew his 2009 charge, which was still pending; he had never amended his 2009 charge to add claims of sexual discrimination. Meanwhile, the Wyoming FEP investigated Mr. Hansen's allegations and issued a finding of probable cause that Mr. Hansen had endured a hostile work environment at SkyWest. After receiving his right-to-sue notice from the EEOC, Mr. Hansen filed this lawsuit.

## DISCUSSION

We review a grant of summary judgment de novo. *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1138 (10th Cir. 2008). "We will affirm the district court's disposition only if our independent review of the record, viewing the facts in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kramer v. Wasatch Cty. Sheriff's Office*, 743 F.3d 726, 736 (10th Cir. 2014) (brackets and citation omitted). We also review de novo the district court's application of state law. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

### I. Hostile Work Environment

Under Title VII, a plaintiff must file a timely charge with the EEOC or a state agency before filing suit. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (citing 42 U.S.C. § 2000e–5(e)(1)). In states like Wyoming, which have prohibited discrimination under § 2000e–5, *see* Wyo. Stat. Ann. § 27–9–105, the charge must be filed within 300 days "after the alleged unlawful employment practice occurred," § 2000e–5(e)(1).

When it comes to discrete acts of discrimination or retaliation, the application of Title VII's limitations period is straightforward: "A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Morgan*, 536 U.S. at 110, 122 S.Ct. 2061. But hostile work environment claims are different. "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 117, 122 S.Ct. 2061. Thus, "[t]he 'unlawful employment practice' . . . cannot be said to occur on any particular day." *Id.* at 115, 122 S.Ct. 2061. Rather, it takes place over time, "and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* Consequently, "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117, 122 S.Ct. 2061. The court's task, then, "is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Id.* at 120, 122 S.Ct. 2061.

Although *Morgan* itself does not provide precise instruction on how to evaluate whether the offending acts were part of "the same actionable hostile work environment practice," we have recognized several non-exclusive factors to guide the analysis. *See Duncan v. Manager, Dep't of Safety, City & Cty. of Denver*, 397 F.3d 1300, 1309 (10th Cir. 2005). In *Duncan*, we considered whether the pre- and post-limitations period acts were "related by type, frequency, and perpetrator." *Id.* We have also looked to whether the acts occurred when the employee "was working in the same place." *Tademy*, 614 F.3d at 1144. These factors are not exhaustive: *Morgan* "does not limit the relevant criteria, or set out factors or prongs." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010); *see also Tademy*, 614 F.3d at 1143 (rejecting a "strict 'type, frequency, and perpetrator' test"). "[F]lexibility is useful in a context as fact-specific and sensitive as employment discrimination and as amorphous as hostile work environment." *McGullam*, 609 F.3d at 77.

[8] Conversely, an employer will not be liable when there is "no relation" between the pre- and post-limitations acts, or if "for some other reason, such as certain intervening action by the employer," the later acts are no longer part of the same hostile work environment claim. *Morgan*, 536 U.S. at 118, 122 S.Ct. 2061.

Here, the district court misapplied *Morgan*. It held that Mr. Hansen could not include as part of his hostile work environment claim any act of sexual harassment occurring before October 13, 2010—300 days before his 2011 charge. But the district court did not properly evaluate whether the sexual harassment that went on before October 13, 2010, was related to the acts that occurred within the 300-day limitations period. Instead, the district court seems to have been persuaded by SkyWest's argument that Mr. Hansen should be barred from including any events that occurred more than 300 days before he filed his 2011 charge because "[a]llowing an employee to double file in this matter," i.e., by filing one charge in 2009 for age and disability discrimination and then another in 2011 for sex-based discrimination, "would violate the most basic *res judicata* principles." A70. At the very least, the district court's lengthy discussion of the 2009 charge suggests it fac-

tored into the court's analysis. But the 2009 charge is immaterial to the *Morgan* "relatedness" inquiry; it simply has no bearing on whether the harassing acts were similar.

The district court also said that Mr. Robinson's temporary transfer to Seattle was "problematic" for Mr. Hansen's argument because the harassment abated for the six months Mr. Robinson was away. A758. But, as the Supreme Court has recognized, "it does not matter whether nothing occurred within the intervening ... days so long as each act is part of the whole." *Morgan*, 536 U.S. at 118, 122 S.Ct. 2061. Furthermore, Mr. Robinson's transfer was not the kind of "intervening action by the employer" that may sever an otherwise related series of acts. *See id.* SkyWest did not intervene to remedy the situation; Mr. Robinson left Jackson of his own volition because his relationship with Mr. Katoa had come to an end. *See Vickers v. Powell*, 493 F.3d 186, 199 (D.C. Cir. 2007) (holding that a "routine personnel action[ ]" that was not "intended to address" the hostile work environment does not "sever the earlier incidents from the more recent incidents").

The district court also quoted *Duncan* out of context. We said in *Duncan* that "Title VII is not intended to allow employees to dredge up old grievances." *Duncan*, 397 F.3d at 1308. True, "[u]nlitigated bygones are bygones," *id.* but this case is not like *Duncan*. In *Duncan*, the plaintiff alleged she had suffered various types of sexual harassment over twenty years in seven different departments by several different coworkers. *See id.* at 1304–08. By contrast, Mr. Hansen has alleged the same type of sexual harassment (sexual propositions and unwelcome physical contact) over a period of eight years total, and only four years in Jackson; he has identified two primary harassers (Mr. Robinson and Mr. Katoa); and most of the harassment occurred when Mr. Hansen was employed by SkyWest at the Jackson airport.

For instance, the district court improperly excluded from consideration the alleged April 2009 incident where Mr. Robinson rubbed himself against Mr. Hansen's lower body. But this is clearly related to the October 2010 incident, where Mr. Robinson again rubbed himself against Mr. Hansen. Because these two instances of harassment are related by type, perpetrator, and location, and because one occurred within 300 days of the 2011 charge, the district court was wrong not to consider them as part of the same actionable hostile work environment practice. Accordingly, Mr. Hansen has demonstrated a triable issue as to whether this and other incidents constituted "the same actionable hostile work environment practice."

After excluding most of the alleged instances of sexual harassment as time-barred, the district court dismissed Mr. Hansen's hostile work environment claim. It held that the incidents within the 300-day limitations period were "not sufficiently pervasive or severe to support" his claim. A778. We remand for the district court to consider in the first instance whether, taking into account all related acts of sexual harassment, a reasonable jury could conclude that Mr. Hansen's "workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." *Tademy*, 614 F.3d at 1144 (brackets and citation omitted).

## II. Retaliation

 Turning to Mr. Hansen's retaliation claim, Title VII makes it unlawful to retaliate against an employee for opposing practices made unlawful by the statute. 42

U.S.C. § 2000e–3(a). "To prevail on a Title VII retaliation claim, a plaintiff must establish that retaliation played a part in the employment decision[.]" *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008). This burden may be satisfied in one of two ways. Under the direct or "mixed motives" approach, a plaintiff may offer direct evidence that retaliation played a "motivating part" in the adverse employment decision. *Id.* at 1225. If the plaintiff can prove that retaliatory animus was a motivating factor, the burden then shifts to the employer to demonstrate that it would have taken the same action absent the retaliatory motive. *Id.*

■■■■■ Alternatively, in the absence of direct evidence, a plaintiff may proceed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, the plaintiff must first establish a prima facie case of retaliation by showing (1) "that he engaged in protected opposition to discrimination," (2) "that a reasonable employee would have found the challenged action materially adverse," and (3) "that a causal connection exists between the protected activity and the materially adverse action." *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 803 (10th Cir. 2007). "Once the plaintiff successfully asserts a prima facie retaliation case, the burden shifts to the defendant (i.e., employer) to come forward with a legitimate, non-retaliatory rationale for the adverse employment action. If the defendant does so, the plaintiff must show that the defendant's proffered rationale is pretextual." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015) (internal quotation marks, ellipses, and citation omitted). As we have said, "[p]retext can be inferred from evidence revealing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in

the employer's explanation," or it can be shown "by providing direct evidence discrediting the proffered rationale, or by showing that the plaintiff was treated differently from others similarly situated." *Id.* (internal quotation marks and citations omitted). Mr. Hansen has apparently elected to proceed under the *McDonnell Douglas* burden-shifting framework in this case. *See* A245.

■■■■ The district court held that Mr. Hansen had failed to establish his prima facie case. Reasoning that any protected opposition to sex-based discrimination was "too remote in time" from his termination, the district court concluded "there are insufficient facts alleged to support the third element of the prima facie case, a causal connection between the protected action and the adverse acts." A781. But the district court overlooked several, more recent instances where Mr. Hansen reported sexual harassment: He objected to Mr. Robinson's return to Jackson based on his concerns about Mr. Robinson's pattern of harassment; he reminded Mr. Hyllested that he had a pending grievance against Mr. Robinson; he reported to Mr. Hyllested that he was subjected to unwanted, sexual commentary on a daily basis at the ramp area; and he renewed his request for accommodations and explicitly stated that his PTSD was triggered by recent incidents of sexual harassment. (SkyWest also failed to address these 2010 reports in its briefing.)

It is unclear why the district court ignored the 2010 reports. By its terms, Title VII prohibits retaliation against an employee who has "opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e–3(a). The Supreme Court has defined "oppose" in this context by looking to its ordinary meaning: "to resist or antagonize; to contend against; to confront; resist; withstand, ...

to be hostile or adverse to, as in opinion.". *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 276, 129 S.Ct. 846, 172 L.Ed.2d 650 (2009) (citations and ellipsis omitted). Under this broad definition, "[w]hen an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." *Id.* (quotation marks, ellipsis, emphasis, and citation omitted); *see also Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004) ("Protected opposition can range from filing formal charges to voicing informal complaints to superiors."). Even before *Crawford*, we had recognized that Title VII broadly protects an employee who reasonably believes he is opposing a practice made an unlawful practice by Title VII, whether or not an actual violation has occurred. *See Crumpacker v. Kan. Dep't of Human Res.*, 338 F.3d 1163, 1172 (10th Cir. 2003).

Thus, as one example, when Mr. Hansen reported Mr. Robinson's alleged misconduct to Mr. Hyllested in the fall of 2010, Mr. Hansen was engaging in protected opposition. The district court erred in not considering whether a jury could find that Mr. Hansen's termination, which occurred in January 2011, was causally linked to this report and others made around the same time.

### III. Intentional Infliction of Emotional Distress

Wyoming recognizes the tort of intentional infliction of emotional distress as defined in the Second Restatement of Torts. *See Leithead v. Am. Colloid Co.*, 721 P.2d 1059, 1065 (Wyo. 1986) (citing Restatement (Second) of Torts § 46(1)

(Am. Law Inst. 1965)).[3] "To recover for intentional infliction of emotional distress, a plaintiff must prove that the defendant's conduct was extreme and outrageous and that the defendant intentionally or recklessly caused the plaintiff to suffer severe emotional harm." *Kanzler v. Renner*, 937 P.2d 1337, 1341 (Wyo. 1997). Conduct is "outrageous" when it goes "beyond all possible bounds of decency" and is "regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (quoting Restatement (Second) of Torts § 46 cmt. d).

Wyoming has also adopted the Second Restatement's understanding of the roles that judges and juries play in determining "outrageousness": "When presented with a motion for summary judgment, the court, as a matter of law, makes preliminary determinations regarding the outrageousness of the conduct and the severity of the emotional distress." *Id.* This preliminary determination "is simply to decide whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Bevan v. Fix*, 42 P.3d 1013, 1021 (Wyo. 2002). "If this threshold question can be answered either in the affirmative *or* by a finding that reasonable men and women may differ in deciding the issue, then the court must allow a jury to ultimately decide whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Id.*

The Wyoming Supreme Court has applied these principles in a number of employment cases. *See Cook v. Shoshone First Bank*, 126 P.3d 886, 891–92 (Wyo. 2006) (collecting cases). It recognizes "that certain conduct in employment situations may be outrageous enough to provide the

---

**3.** "State law claims before a federal court on supplemental jurisdiction are governed by state law." *Time Warner Entm't Co. v. Everest* *Midwest Licensee, L.L.C.*, 381 F.3d 1039, 1044 (10th Cir. 2004).

employee with a basis of recovery." *Worley v. Wyo. Bottling Co.*, 1 P.3d 615, 628 (Wyo. 2000) (citing *Kanzler*, 937 P.2d at 1341). And it has specifically addressed when "inappropriate sexual conduct in the workplace can, upon sufficient evidence, give rise to a claim of intentional infliction of emotional distress." *Kanzler*, 937 P.2d at 1341–42. Indeed, the Wyoming Supreme Court has emphatically rejected sexual harassment in the workplace: "[O]ur society has ceased seeing sexual harassment in the work place as a playful inevitability that should be taken in good spirits and has awakened to the fact that sexual harassment has a corrosive effect on those who engage in it as well as those who are subjected to it ..." *Id.* at 1342 (quoting *Retherford v. AT & T Commc'ns of Mountain States, Inc.*, 844 P.2d 949, 978 (Utah 1992)).

■ In *Kanzler*, the Wyoming Supreme Court surveyed caselaw on sexual misconduct in the workplace and the tort of intentional infliction of emotional distress. *Id.* at 1342–43. It "discern[ed]" four non-exclusive factors that help courts determine "whether particular conduct in the workplace is sufficiently outrageous to survive a preliminary motion": (1) "Abuse of power"; (2) "Repeated incidents/pattern of harassment"; (3) "Unwelcome touching/offensive, non-negligible physical contact"; (4) "Retaliation for refusing or reporting sexually-motivated advances." *Id.* at 1343. The court in *Kanzler* then found that two of these factors were met in the case before it: the plaintiff alleged "repeated incidents over a period of several weeks in which [the defendant] stared at her, followed her, and subjected her to sexually-motivated advances and physically intimidating behavior, each escalating in intensity and severity," and she alleged she had experienced "unwelcome, non-negligible physical contact wherein [the defendant]

touched and hugged her even after she repeatedly rebuffed his advances, and ultimately confined her in a closet and rubbed his crotch against her leg." *Id.* Although only two of the four factors were present, the court concluded that these "conditions and circumstances" alleged by the plaintiff went beyond "mere insults" or "indignities," and, consequently, that the plaintiff's claim should go to the jury. *Id.*

■ Viewing the evidence in the light most favorable to Mr. Hansen, a jury could find that all four *Kanzler* factors are present here. First, the record contains ample evidence of abuse of power. Mr. Hansen was sexually harassed by supervisors at SkyWest, including his direct supervisors, Mr. Robinson and Mr. Katoa, who threatened his continued employment if he did not submit to their advances. Although "liability does not attach upon the mere existence of an employment relationship," the Wyoming Supreme Court has recognized that "the employer–employee relationship" is a "significant factor in determining outrageousness." *Worley*, 1 P.3d at 629. " 'It is only natural that a defendant's position of power over a plaintiff may enhance his or her ability to do harm.' " *Id.* (citation omitted); *see also* Restatement (Second) of Torts § 46 cmt. e. In fact, it was the employer-employee relationship in *Worley* that pushed the misconduct over the top: the court concluded that the facts of the case were "not outrageous in and of themselves," but "when considered in the context" of the employment relationship, the plaintiff's evidence was "sufficient" to preclude summary judgment. *Worley*, 1 P.3d at 630. Here, too, the employment context bolsters Mr. Hansen's claim.

■ Second, "[r]epeated harassment may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability." *Kanzler*, 937 P.2d at 1343 (citation

and ellipsis omitted). Here, Mr. Hansen was sexually harassed over a considerable period of time.[4] Most of it occurred during the four years Mr. Hansen worked in Jackson. The two primary harassers, Mr. Robinson and Mr. Katoa, repeatedly rubbed against Mr. Hansen, threatened Mr. Hansen with continued sexual harassment, and demanded sexual favors for employment benefits.

Third, Mr. Hansen has provided evidence that he was the victim of unwelcome, non-negligible physical contact. Indeed, the physical contact at issue here is remarkably similar to that in *Kanzler*, where the defendant touched and hugged the plaintiff and, at one point, confined the plaintiff in a closet and rubbed his crotch against her leg. Mr. Hansen has alleged Mr. Robinson and Mr. Katoa repeatedly rubbed against him and both had, on multiple occasions, pushed Mr. Hansen into an unoccupied room to harass him in private.

Regarding the last *Kanzler* factor, and when we draw all inferences in Mr. Hansen's favor, Mr. Hansen has also provided sufficient evidence to support a jury conclusion that he suffered retaliation for refusing and reporting sexually motivated advances.

Even if this were not enough, conduct that may not otherwise be outrageous may become so based on the actor's knowledge that the victim is particularly susceptible to emotional distress by reason of *some* physical or mental condition or peculiarity. *See* Restatement (Second) of Torts § 46, cmt. f. Mr. Hansen's tormentors knew he suffered from PTSD, but they targeted him anyway.

In conclusion, viewing the evidence in the light most favorable to Mr. Hansen, reasonable persons could differ as to whether the conduct was extreme and outrageous. Consequently, the district court was wrong to dismiss Mr. Hansen's claim for intentional infliction of emotional distress on this ground.

## CONCLUSION

We **REVERSE** the district court's grant of summary judgment with respect to Mr. Hansen's claims for sexual harassment, retaliation, and intentional infliction of emotional distress. We **AFFIRM** the district court's grant of summary judgment regarding the disparate treatment claim. We **REMAND** the case for further proceedings consistent with this opinion.[5]

---

4. Defendant argues that the four-year statute of limitations for IIED claims limits our inquiry to events occurring between October 25, 2009, and October 25, 2013, when the original complaint was filed. Not so. Under Wyo. Stat. Ann. § 1-3-105, an action for the intentional infliction of emotional distress must be brought within four years "after the cause of action accrues." *See VanLente v. Univ. of Wyo. Research Corp.*, 975 P.2d 594, 598 (Wyo. 1999). A cause of action for the intentional infliction of emotional distress accrues only after the plaintiff experiences "severe emotional distress." *See Lucky Gate Ranch, L.L.C. v. Baker & Associates, Inc.*, 208 P.3d 57, 65 (Wyo. 2009) ("A cause of action accrues for statute of limitation purposes when all elements of the cause of action are present, including damages."). Because it has not yet been determined whether and when Mr. Hansen experienced severe emotional distress, our decision contemplates that the parties and the district court will address this issue on remand. We also do not address here how Wyoming law treats an employer's liability for an IIED claim.

5. We do not express an opinion regarding quid pro quo harassment or coworker harassment. Although the district court should have

addressed Mr. Hansen's quid pro quo and coworker harassment claims, it will have an opportunity to do so on remand. On the evidentiary issue, we do not understand the district court's initial exclusion of the Doak declaration to foreclose further consideration on remand, including whether it contains any out-of-court statements which would be excludable as hearsay.