**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**March 30, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

JENNIFER HORAL, a Colorado resident,

    Plaintiff - Appellant,

v.

IHR, INC., a Colorado corporation, d/b/a
Mike Ward Maserati,

    Defendant - Appellee.

No. 20-1062
(D.C. No. 1:18-CV-01313-RM-NYW)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **McHUGH**, **BALDOCK**, and **EID**, Circuit Judges.
_____

Plaintiff-appellant Jennifer Horal brought suit against her former employer, defendant-appellee IHR, Inc., claiming that IHR terminated her employment and took other actions against her in retaliation for a complaint she made about an IHR teambuilding exercise. After discovery, the district court granted summary judgment to IHR. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I.**

IHR employs individuals who work at Mike Ward Maserati and Mike Ward Infiniti, car dealerships located in Highlands Ranch, Colorado. Both dealerships are

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

owned by Michael Ward, who served as the dealerships' general manager during the time period at issue. On August 11, 2016, Horal applied for a sales consultant position with IHR. At the time she applied, Horal had five years of experience selling automobiles.

On August 29, 2016, Robert Thumel, a sales manager at Mike Ward Maserati, extended an offer of employment to Horal on behalf of IHR. Thumel decided to hire Horal primarily because of her prior experience. On September 7, 2016, Horal obtained a temporary salesperson license and began selling vehicles for IHR.

Horal was employed at the Mike Ward Maserati dealership. Thumel and Mark Todd, another sales manager at Mike Ward Maserati, served as Horal's supervisors. While Horal worked for IHR, there were six or seven total sales consultants at Mike Ward Maserati.

During this time, IHR convened all sales staff from both Mike Ward dealerships each Friday morning for a mandatory sales meeting led by Peter Kim, the general manager of Mike Ward Infiniti. One such meeting occurred on October 7, 2016. At that meeting, Kim hosted a "Family Feud"-style teambuilding game during which IHR sales employees guessed the most popular responses to various questions. The final question of the game asked: "Name a reason that your boss would give you a raise (other than that you work hard)." App'x at 98 (capitalization altered). Horal answered by saying "get more education, get a certificate or degree," but Kim said that answer was "not on the board." *Id.* at 13 (internal quotation marks omitted).

2

Kim then revealed the top answer to be "dating your boss." *Id.* at 59 (capitalization altered) (internal quotation marks omitted).[1]

The "dating your boss" answer left Horal feeling uncomfortable. She was concerned that this "top answer" was meant to suggest that female sales consultants such as herself should sleep with their bosses to get ahead. Thus, on October 10, 2016—the Monday following the sales meeting—Horal approached Ward to complain about the "dating your boss" answer. She asked Ward, "[W]hat if a wom[a]n ever gets a promotion here, what will people think?" *Id.* at 99 (internal quotation marks omitted). Ward told Horal that he suspected Kim had simply found some Family Feud questions on the internet and did not mean anything by the "dating your boss" answer. He also suggested that Horal "talk to [Kim] so that he knows he should be more careful with his content in the future," and said that he would do the same. *Id.* Finally, he asked Horal to "put it behind her and try and get some cars sold." *Id.* at 100.

Later that day, Ward sent a follow-up email to Horal summarizing what they had discussed. He apologized if Horal had been offended by Kim's teambuilding exercise, and, in response to Horal's question about what people would think if a woman were ever promoted, he noted that IHR did have women in management positions. He further advised Horal that he had spoken to Kim on the phone, and that

---

[1] Horal says that this answer might have been "sleeping with your boss" rather than "dating your boss." *See* App'x at 161. The district court, however, found this to be a "distinction without a difference," *id.* at 338 n.4, and on appeal, Horal does not contest that determination, *see* Aplt. Br. at 8.

Kim had reported the questions used during the game were indeed randomly picked from the internet. Ward relayed that Kim was sorry if he had made anyone uncomfortable, as that was not his intent. Additionally, Ward told Horal that he had instructed Kim to be more careful and considerate when running sales meetings in the future.

Horal replied to Ward's email the following afternoon. In her reply, Horal brought to Ward's attention that (1) although he was right that there were women in management positions at IHR, there were no women "in the upper echelons of management, including finance and sales managers," and (2) she and Juliana Leach, a sales consultant at Mike Ward Infiniti, were the only two women in the room when the Family Feud game was played. *Id.* at 103. She also told Ward that it was "important to speak [her] truth in writing for [Kim] to see as well," and that she "look[ed] forward to meeting with [Kim]" because she had "some questions [she] would like to ask him." *Id.* Even though she pushed back against some of the points Ward had made, Horal concluded on a cordial note. She expressed that she "anticipate[d] an even more healthy, prosperous, and fun work environment" after she and Kim talked through this issue. *Id.*

On October 17, 2016, Horal, Ward, Kim, and an IHR human resources representative, Laura Sandberg, met. Kim apologized to Horal for the "dating your boss" answer, reiterating that he had not intended to offend her or anyone else. Horal asked Kim if he thought the answer was offensive. Kim replied that he did not think

4

so at the time, but now that it had been brought to his attention, he could see why Horal was offended.

At some point, Ward took over the conversation. Ward asked Horal if she had discussed the Family Feud game with other employees at the dealership, and Horal confirmed that she had. Ward said he did not think that talking about the game with other employees was a good idea because "gossiping about the event" could make it worse. *Id.* at 119 (internal quotation marks omitted). Ward suggested that, instead, Horal should discuss the incident just with him, Kim, Sandberg, and/or her supervisor. Horal stated that she "agreed 100% and realized that her approach could make a forest fire out of a small flame." *Id.*

The discussion then shifted to the subject of other conversations in which Horal was engaging at the dealership. In particular, Ward mentioned that he had heard Horal was talking to others about her troubles with an "ex," and he told Horal that going into details about her personal life at work could make others feel uncomfortable. *Id.* (internal quotation marks omitted). Horal stated she "understood and agreed with [Ward's] concerns." *Id.*

Toward the end of the conversation, Ward emphasized that the "goal here is to sell cars and make money and have fun." *Id.* In that vein, he observed that since she had been hired, Horal had only sold one vehicle. Horal informed Ward that she had actually sold two vehicles—she had sold her second one just that past Saturday, October 15th. Ward congratulated Horal on the sale. But at the same time, Ward noted that on the same Saturday, Horal had let a customer leave without introducing

5

her to a manager.  Horal acknowledged that this was true.  The conversation ended with Ward asking Horal to more closely adhere to the dealership's "Early Manager Involvement" policy in the future.  *Id.*

Horal says that at some point after she first talked to Ward about the Family Feud game, her phone stopped receiving sales calls.  She told management about the issue and, after about a week, IHR fixed Horal's phone.  Horal also claims that around this time her sales managers stopped referring sales leads to her.

It has historically been IHR's practice to review a sales consultant's performance during his or her first few months of employment.  Thus, near the end of Horal's second month (October 2016), Thumel evaluated Horal.  To do so, he looked at Horal's customer relationship management ("CRM") activity report, which measured Horal's number of referrals, sales, appointments, shown vehicles, and "BeBacks" (customers who enter the dealership without making a purchase).  *Id.* at 128.  The report revealed that Horal had only sold three vehicles since starting.  According to Thumel, this number was below his expectations, especially given Horal's "prior experience selling vehicle[s] and her stated success in doing so."  *Id.* at 90.  In fact, Horal's sales were the worst at Mike Ward Maserati over the two months that Horal had worked there—even worse than the sales of the two other new consultants hired during that time, who had no prior sales experience.  To make matters worse, Horal had a history of not following dealership protocols, and, based on his observations, Thumel felt Horal "lacked energy, was not engaged[,] and was

6

often on her cell phone." *Id.* at 91. For these reasons, Thumel says, he decided to terminate Horal's employment.

Before firing Horal, Thumel advised Ward of his decision. Thumel says that "Ward did not object to the termination, but had no other involvement in [the] decision." *Id.* at 92. Thumel also states that Kim "had absolutely no role or involvement in [the] decision to terminate Ms. Horal," and that "[his] decision to terminate Ms. Horal's employment had absolutely nothing to do with any issues or concerns she had with Peter Kim's Family Feud sales presentation or any concerns or complaints she may have made to others about the presentation." *Id.* On November 1, 2016, Thumel let Horal go.

After her termination, Horal filed a retaliation charge with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a notice of right to sue. Horal then initiated this case against IHR in the District of Colorado, alleging that IHR retaliated against her for complaining about the Family Feud game in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17. After the completion of discovery, IHR moved for summary judgment.

The district court granted IHR's motion, determining that Horal failed to present a genuine issue of material fact sufficient to defeat summary judgment. Horal now appeals.

## II.

Horal asserts that IHR retaliated against her by preventing her from receiving sales calls, ceasing to refer sales leads to her, and ultimately terminating her

employment.  First, we review the legal principles relevant to this suit.  We then assess Horal's employment-termination claim.  Finally, we analyze the claims concerning Horal's telephone and sales leads.

**a.**

"[W]e review the district court's grant of summary judgment de novo, applying the same standards that the district court should have applied." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019) (alteration in original) (internal quotation marks omitted) (quoting *EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1037 (10th Cir. 2011)).  A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In applying this test, "we consider the evidence in the light most favorable to the non-moving party." *Tesone*, 942 F.3d at 994 (internal quotation marks omitted) (quoting *C.R. Eng.*, 644 F.3d at 1037).  Nonetheless, "[t]o avoid summary judgment, the evidence must be such that a reasonable jury could return a verdict for the nonmoving party." *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993). "[U]nsupported and conclusory statement[s] . . . are insufficient to defeat summary judgment," *Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 977 (10th Cir. 2018), and "[s]ummary judgment may be granted if the evidence is merely colorable or is not significantly probative," *Vitkus*, 11 F.3d at 1539.

Title VII prohibits "retaliat[ion] against an employee for opposing practices made unlawful by the statute." *Hansen v. SkyWest Airlines*, 844 F.3d 914, 924 (10th

Cir. 2016). To prevail on a Title VII retaliation claim, "a plaintiff must establish that retaliation played a part in the employment decision." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008). "Where, as here, the plaintiff does not have direct evidence of retaliation," we apply the framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to determine whether the plaintiff has made such a showing. *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 655 (10th Cir. 2013). Under this framework, a plaintiff must first establish a prima facie case of retaliation. *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1233 (10th Cir. 2015). If the plaintiff does so, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its actions. *Id.* at 1234. If the defendant proffers such a reason, the burden then shifts back to the plaintiff to show by a preponderance of the evidence that the defendant's stated reason is pretextual. *Id.* Here, the parties conceded below that Horal has established a prima facie case and that IHR has articulated a legitimate, nondiscriminatory reason for its actions. *See* App'x at 344–45. Thus, the only question is whether Horal has shown pretext.

"[A] plaintiff can establish pretext by showing the defendant's proffered non-discriminatory explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief." *C.R. Eng.*, 644 F.3d at 1038–39 (alterations in original) (internal quotation marks omitted) (quoting *Johnson v. Weld Cty.*, 594 F.3d 1202, 1211 (10th Cir. 2010)). In assessing whether the plaintiff has made this showing, we "look at the facts as they appear to the person making the decision to terminate." *Kendrick v. Penske Transp.*

*Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000). The plaintiff "carries the full burden of persuasion." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) (quoting *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005)).

**b.**

We start with Horal's employment-termination claim. Horal fails to show that the reasons given by Thumel—the person who made the decision to terminate her—were pretextual. As Thumel explained in his declaration, Horal had a history of not following dealership protocols, and his perception was that she "lacked energy, was not engaged[,] and was often on her cell phone." App'x at 91. When Thumel looked at Horal's sales at the end of October, he found that Horal had the worst record of those working at Mike Ward Maserati during the relevant period, having sold only three vehicles over her two months there. *See id.* at 90–91.[2] By contrast, Matt Rice, who was hired in August 2016, had sold six vehicles in his first two months, and Tyler Kalil, who was also hired in August 2016, had sold four vehicles in his first two months. *Id.* at 91. Further, Horal's number was especially poor compared to those of experienced sales consultants at Mike Ward Maserati, who "sold between a combined 14.5 and 26 vehicles for September and October of 2016." *Id.* Based on

---

[2] The parties dispute whether we should treat Horal as having worked at IHR for two months or for three (Horal advocates for two months; IHR, three). *See* Aplt. Br. at 18–25; Aple Br. at 23–26. Because we "look at the facts as they appear to the person making the decision to terminate," *Kendrick*, 220 F.3d at 1231, and because Thumel says he viewed Horal as having worked at the dealership for two months, App'x at 90, we adopt the two-month framing.

10

his observations and these numbers, Thumel found Horal's performance to be unsatisfactory, especially since he had hired Horal because of her prior experience. *Id.* He thus decided the best course of action was to let Horal go. *Id.* at 91–92. This explanation is not "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [it is] unworthy of belief." *C.R. Eng.*, 644 F.3d at 1039 (internal quotation marks omitted) (quoting *Johnson*, 594 F.3d at 1211).

Horal offers four reasons for finding pretext, but none undermines Thumel's explanation as to why he terminated Horal's employment. First, Horal points out that the difference in sales between her and the consultant with the next lowest number of sales, Kalil, was low—she sold three vehicles in two months, and Kalil sold four. Although this observation is accurate, we have recognized that an employer need not terminate all its low-performing employees simultaneously to defeat a claim of pretext. *See Sampson v. Integra Telecom Holdings, Inc.*, 461 F. App'x 670, 674 (10th Cir. 2012) (unpublished).[3] Here, (1) Horal's sales were indisputably the lowest at the dealership, and (2) Thumel had reason to think Horal's sales would not sufficiently improve, given that Horal already had substantial experience. In these circumstances, the fact that Thumel did not also terminate Kalil for low sales does not demonstrate pretext.

---

[3] Unpublished cases cited in this decision are not binding precedent, but we consider them for their persuasive value. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

Next, Horal attempts to cast doubt on Thumel's claim that he made the decision to terminate Horal's employment without anyone else's input. She maintains that "in light of the fact that Thumel had, by his own admission, 'conferred with Mike Ward advising him of the decision, and Mr. Ward did not object to the termination,' it would not be unreasonable for a jury to infer that Mr. Ward played a role in the decision to discharge her." Reply Br. at 5 (cleaned up) (quoting App'x at 92). This argument is purely speculative. When a decisionmaker claims to have acted alone, we must accept that claim absent evidence to the contrary. *See Bir v. Pfizer, Inc.*, 510 F. App'x 29, 31–32 (2d Cir. 2013) (unpublished). Horal offers no such evidence, and thus has not carried her burden.

Third, Horal tries to show pretext through evidence of differential treatment by comparing herself to other employees in similar circumstances. *See, for example*, *Swackhammer*, 493 F.3d at 1170–73 (employing the differential treatment approach). She claims that data drawn primarily from the years 2014 to 2018 demonstrate that IHR has allowed other new employees to continue working as sales consultants beyond the two-month mark despite having sales numbers that were the same as or worse than her own. These data are of no value. As Horal herself points out, for another employee to be a proper comparator to her, both that employee and Horal must have "deal[t] with the same supervisor." Aplt. Br. at 26 (alteration in original) (internal quotation marks omitted) (quoting *Herrera v. United Airlines, Inc.*, 754 F.

12

App'x 684, 693 (10th Cir. 2018) (unpublished)).[4]  This is because "[d]ifferent supervisors will inevitably react differently" when faced with the same employee conduct, such as low sales.  *Kendrick*, 220 F.3d at 1233.  Horal does not claim that these comparators were supervised by Thumel.  For that reason, her reliance on these comparators is misplaced.

Fourth and finally, Horal argues that pretext is evident from the fact that, at her October 17th meeting with Kim, Ward, and Sandberg, Ward "aggressively attacked [her] on several matters, including her temerity to discuss the Family Feud matter with other employees, her conversations with other sales consultants about her personal life, and her sales record."  Aplt. Br. at 14.  Horal's assertion that Ward "attacked" her is belied by the record.  Sandberg's contemporaneous notes from that meeting, the accuracy of which Horal has never challenged, indicate that Horal took Ward's criticisms well.  *See, e.g.*, App'x at 119 (reporting that Horal "said that she understood and agreed 100%" that she should not have talked about the Family Feud issue with other employees and "realized that her approach could make a forest fire out of a small flame").  Moreover, we have rejected the notion that a plaintiff can avoid summary judgment merely by showing that, at a meeting to discuss an employee's grievance, the employee's supervisor expressed concerns about the

---

[4] Horal makes this observation in the course of challenging the validity of a comparator offered by IHR.  At this step of the *McDonnell Douglas* framework, however, the burden is on Horal to show pretext.  Because Horal does not carry her burden, we have no need to consider IHR's comparator.

13

employee's performance. *See Sampson*, 461 F. App'x at 672, 674. Accordingly, this final attempt at showing pretext falls short.

In the end, Horal has only one piece of evidence in her favor: the temporal proximity between her complaint and the decision to terminate her. "[T]emporal proximity alone," however, is not "sufficient to defeat summary judgment." *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004). Horal has not met her burden to show pretext, and thus the district court properly granted summary judgment on this claim.

**c.**

We conclude by addressing Horal's claims that IHR retaliated against her by (1) causing her telephone to stop receiving sales calls for approximately one week and (2) ceasing to refer sales leads to her. Both claims are meritless.

Horal supplies no evidence that IHR caused Horal's telephone problems. She merely argues that it is reasonable to infer causation because the problems began shortly after she complained about the Family Feud game. Again, "[t]emporal proximity alone" is not "sufficient to defeat summary judgment." *Id.* Summary judgment on this speculative claim, therefore, was appropriate.

Similarly, Horal provides insufficient support for her allegation that her supervisors stopped giving her sales leads. The only evidence she offers is her own affidavit, in which she states, in full, that "sales managers stopped sending me sales leads, as they had previously been doing." App'x at 162. This affidavit is "conclusory" and thus "[w]e do not consider [it]." *Ellis v. J.R.'s Country Stores,*

14

*Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015) (quoting *Garrett v. Hewlett-Packard Co.*,

305 F.3d 1210, 1213 (10th Cir. 2002)).  Additionally, in any event, Horal's claim is

belied by her CRM activity report, which demonstrates that she received a large

number of leads while she worked for IHR.  Horal suggests that her CRM report

overstates the number of "Internet leads" she received, Aplt. Br. at 9, but her briefing

does not otherwise contest the accuracy or relevancy of this document.  In short, this

claim too was properly disposed of at summary judgment.

## III.

For the foregoing reasons, we AFFIRM the judgment of the district court.

Entered for the Court


Allison H. Eid
Circuit Judge