FILED
**United States Court of Appeals
Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**August 23, 2022**

**Christopher M. Wolpert
Clerk of Court**

LA'TONYA FORD,

    Intervenor Plaintiff - Appellant,

v.

JACKSON NATIONAL LIFE
INSURANCE COMPANY; JACKSON
NATIONAL LIFE DISTRIBUTORS LLC;
JACKSON NATIONAL LIFE
INSURANCE COMPANY OF NEW
YORK,

    Defendants - Appellees.

No. 21-1126

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:16-CV-02472-PAB-SKC)**

_____

David C. Japha (Evan J. House with him on the brief), of Levin Jacobson Japha, P.C.,
Denver, Colorado, for Plaintiff-Appellant.

Robert Hochman of Sidley Austin LLP, Chicago, Illinois (David A. Gordon and Martha
C. Clarke of Sidley Austin LLP, Chicago, Illinois; Heather Carson Perkins, Andrew J.
Ball, and Ellen E. Boshkoff of Faegre Drinker Biddle & Reath LLP, Denver, Colorado,
with him on the brief), for Defendants-Appellees.

_____

Before **MATHESON**, **PHILLIPS**, and **EID**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

La'Tonya Ford is an African-American woman who worked at Jackson National Life Insurance ("Jackson") for about four years. During her time there, Ford allegedly suffered sex- and race-based discrimination; faced retaliation for complaining about her treatment; endured a hostile work environment; and was constructively discharged. After she left Jackson for another job, Ford sued the company for (1) discrimination; (2) retaliation; (3) hostile work environment; and (4) constructive discharge.

Jackson moved for summary judgment. The district court granted Jackson's motion and dismissed all of Ford's claims. Ford now appeals, urging us to reverse the court on each claim. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the dismissal of her discrimination claim. But we reverse in part the dismissal of her retaliation claim; her hostile-work-environment claim; and her constructive-discharge claim.

## BACKGROUND

### I.    Factual Background

In 2006, Ford was hired as an internal wholesaler at Jackson's Atlanta office. In 2007, after the Atlanta office was closed, Ford transferred to Jackson's Denver office.

In early 2008, Jackson held an off-site work party. It was held at the home of John Poulsen, one of Jackson's regional directors. At least twenty other Jackson employees attended the party. Ford alleges that during the party, Poulsen told her to "get on your knees," placed a vodka bottle in his pelvic region, and then started

2

"thrusting the bottle." Appellant R. vol. 2 at 289. Ford admits that she did not report this incident to Jackson's HR department. *See* Appellant R. vol. 3 at 365 ("[I]t didn't make any sense for me to go HR and complain again[.]"). But she believes that this type of behavior was emblematic of the hostile work environment she had to endure at the company.

In 2009, Ford was promoted from an internal wholesaler to a business development consultant. Between July 2009 and September 2010, Ford applied to fill any of eleven higher-ranking positions.[1] She applied once to be a director of advanced planning, twice for a desk-director position, and eight times for an external-wholesaler position—a highly coveted position within Jackson. For most of these positions, she made the shortlist and was interviewed. *See* Supp. R. at 132–33; *see also* Appellant R. vol. 3 at 676 (internal email stating that Ford was on the shortlist for an external-wholesaler position). But each time, Jackson chose someone else.

Jackson attributed Ford's lack of success to her not interviewing as well as the other candidates. But Ford thought something more nefarious was going on—she believed she was being discriminated against based on her race and gender.

On September 10, 2009, Ford's then-supervisor, Corey Walker, placed her on a performance improvement plan ("PIP"). The PIP charged Ford with certain

---

[1] The record is imprecise on the number of promotional positions Ford applied to. On appeal, Ford claims she wasn't promoted "on some eleven different occasions, including eight [external wholesaler] positions." Opening Br. at 13. But in her interrogatory response, Ford states that she applied to twelve promotional positions, nine of which were external-wholesaler positions. We assume that she applied to eight external wholesaler positions and eleven higher-ranking positions.

performance deficiencies, such as "failing to meet her talk time requirement, being unwilling to help her peers, and failing to complete management requests." Appellant R. vol. 2 at 429.

The next day, in response to receiving the PIP, Ford submitted a four-page complaint to Jennifer Amsberry, who worked in Jackson's HR department. The complaint alleged that Walker had treated Ford unfairly and outlined other inappropriate conduct at Jackson. For instance, Ford alleged that Walker had allowed his team to have "racial and sexual discussions without reprimand" and had created an "unfair work environment that is prejudic[ial]." Supp. R. at 147.

To address Ford's complaint, Gary Stone (the head of Jackson's HR department who worked in Jackson's Michigan office) and Amsberry spent about two months investigating Ford's allegations. In November 2009, Stone and Amsberry concluded their investigation, finding that Ford hadn't been discriminated or retaliated against. Nor did they find that she was subject to a hostile work environment. Still, Stone wanted Ford to have a "fresh start" and agreed to rescind the PIP and to give her a new supervisor. Appellant R. vol. 2 at 430.

Robert Blanchette became Ford's supervisor. Ford shared with Blanchette that people on her team would often act inappropriately towards her. For example, Ford told Blanchette that her male coworkers would talk about her breasts and throw things at her. Based on what Ford had told him, Blanchette advised Walker "to watch this [situation] a little more closely." Appellant R. vol. 3 at 588. But Walker said that Ford was "making a big deal out of nothing." Appellant R. vol. 3 at 588.

4

On December 7, 2009, Ford submitted a formal complaint to the Equal Employment Opportunity Commission ("EEOC"). She alleged that Jackson had not promoted its minority employees at the same rate as its non-minority counterparts, that she experienced a hostile work environment, and that she was being retaliated against for complaining about this behavior.

Ford listed examples of the improper treatment she was receiving. These included: (1) her not receiving performance-based awards and benefits; (2) her not being promoted to higher-ranking positions; and (3) her being singled out by Walker for unfair treatment. Ford also alleged that Walker allowed workers to have "openly racist and sexual discussions." Appellant R. vol. 4 at 950. As examples, she said that after Barack Obama was elected president, her coworkers made comments such as "Watermelon is going to be on sale," and "Chevy Impalas will be discounted." *Id.* She also alleged that Walker allowed Alex Crosby, one of her coworkers, to share pornographic images with the team, and he allowed Crosby to ask Ford sexually explicit questions, such as "How big are your boobs?" and "What size bra do you wear?"—without reprimand. *Id.* Finally, she alleged that, after she complained about this behavior, Walker retaliated against her by placing her on a PIP and unfairly scrutinizing her work.

Sometime in late 2009, James Bossert, one of Jackson's vice-presidents, ordered Blanchette to give Ford a negative evaluation. Blanchette testified that the negative evaluation was Jackson's way of "building a case" against Ford. Appellant R. vol. 3 at 584. According to Blanchette, Bossert thought that Ford "was more

trouble than she's worth in this organization, and she's not going to be promoted to an external [wholesaler]," so it would be better to "figure out how to get rid of her." Appellant R. vol. 3 at 578. Indeed, Blanchette testified that during a meeting discussing potential candidates for an external-wholesaler position, when someone mentioned Ford's candidacy, Bossert laughed and said, "Let her try." Appellant R. vol. 3 at 587. Despite Bossert's instructions, Blanchette declined to give Ford a negative evaluation, instead evaluating Ford's work as "meet[ing] expectations." *See* Appellant R. vol. 2 at 352. Ford agreed that this evaluation was appropriate.

Blanchette also testified that Bossert wanted him to fire Ford and another African-American, female employee, Kimberly Funchess. Appellant R. vol. 3 at 580 ("Q: He instructed you to actually terminate them? A: He did."). Blanchette refused.

In January 2010, two vice-presidents who reported to Bossert, Paul Fitzgerald and Jack Mishler, met with Blanchette. Fitzgerald and Mishler told Blanchette that he wasn't "a leader because [he] refused to get rid of Funchess and Ford." Appellant R. vol. 3 at 579. They insinuated to Blanchette that he would be fired if he did not fire Ford and Funchess.

In February 2010, Jackson fired Blanchette. Blanchette believes he was terminated for not firing Ford and Funchess. After his firing, Blanchette testified about the derogatory comments that he had heard Mishler, Fitzgerald, and Bossert make about Ford and Funchess. For example, he testified that he heard Mishler call

6

Ford and Funchess "Black bitches" and "Black Panthers."[2] Appellant R. vol. 3 at 581–82. Blanchette also testified that Bossert would call Ford and Funchess "resident street walkers."[3] Appellant R. vol. 3 at 579.[4]

After Blanchette's firing, Bossert was assigned as Ford's supervisor. Ford raised concerns with Stone that Bossert and Walker were treating her unfairly. For example, she alleged that she had been denied a yearly merit award and promotions because of her race and gender. Ford also believed that the territories that she had cultivated were being unfairly reassigned to other coworkers, which negatively affected her pay. She also complained that she was being asked to train her colleagues more than were her white, male counterparts. Ford alleged that this added training time also adversely affected her pay because it gave her less time to develop her territories. Finally, Ford complained that Walker and Bossert were not giving her timely quarterly evaluations, which affected her ability to improve. In May 2010, Ford supplemented her EEOC charge with these same complaints.

---

[2] Blanchette also testified that Bossert would call Funchess a "piece of shit." Appellant R. vol. 3 at 577.

[3] Ford testified that she had learned from another employee that Bossert had called her a "bitch[] from Atlanta" during a supervisors' meeting. Appellant R. vol. 2 at 374.

[4] The district court, without specification, stated that some of these statements are "inadmissible hearsay." Appellant R. vol. 4 at 920. But Jackson has acknowledged that it "does not seek affirmance on that basis." Response Br. at 19. Instead, Jackson argues that these statements are neither direct nor circumstantial evidence of discrimination. *Id.* So we consider these statements only in those contexts. We express no position on the merits of the district court's hearsay ruling.

On September 10, 2010, Bossert emailed Stone. Bossert noted his concern that Ford had applied for another promotion. Bossert asserted his belief that Ford would "leverage that position into an opportunity to work against the company's interest by furthering her complaint." Appellant R. vol. 3 at 661. The relevant portion of the email states:

> She has posted for the vacant desk director position in RBD East. I firmly believe that she would attempt to leverage that position into an opportunity to work against the company's interest by furthering her complaint. That she continues to engage in behavior that clearly demonstrates her inability to avoid a conflict of interest is troubling.

Appellant R. vol. 3 at 661. Stone responded to the email suggesting that Bossert "should not express in e-mails sentiments like the one [he] expressed." Appellant R. vol. 2 at 563. Ford was ultimately not offered the position.

On September 15, 2010, Ford again supplemented her EEOC charge. She continued to allege that she was being denied promotions, and that her less-qualified white, male colleagues were being promoted over her. Ford also included added allegations of the hostile work environment she had experienced at Jackson. These included the vodka-bottle incident from January 2008; that in July or August 2010, Crosby had told her that "he likes a 'little milk or cream between my chocolate chip cookies,' referring to [her] breasts"; and that she had seen "sexually explicit and discriminatory emails being exchanged between the white male Business Development Consultants and Internal Wholesalers." Appellant R. vol. 3 at 741.

In October 2010, Ford obtained an external-wholesaler position at a competing company. So she gave Jackson her two-week notice. That same day, as Ford was

getting ready to leave work, Crosby dared another Jackson employee, Andy Foy, to throw at Ford a "Black Rock promotional football that had been defaced" by replacing the "R" with a "C." Appellant R. vol. 2 at 297. Foy threw the ball at Ford.

Ford notified Stone about the incident, telling him, "You haven't done anything to stop the discrimination. It's only increased . . . . And so effective today, I am no longer employed or going back to Jackson National." Appellant R. vol. 2 at 441. In response, Stone flew to Denver and fired the two workers involved in the incident. Jackson then held a meeting with the 400 people in the Denver office to reinforce that such conduct would not be tolerated. Jackson's president also wrote a letter apologizing to Ford.

## II. Procedural Background

In 2016, the EEOC sued Jackson. The complaint alleged that Jackson had "engaged in unlawful discrimination" on the basis of race and sex. Appellant R. vol. 1 at 47–48. Multiple former employees, including Ford, intervened in the case.

In January 2020, the district court entered a consent decree. In exchange for resolving all claims against it, Jackson agreed to pay monetary compensation to the intervenors and other employees on behalf of whom the EEOC had sought relief. Ford was the only party who did not join the consent decree. By declining to join, Ford was allowed to individually pursue her claims against Jackson.

Jackson moved for summary judgment on Ford's claims of discrimination, retaliation, hostile work environment, and constructive discharge. The district court granted Jackson's motion and dismissed all of Ford's claims. This appeal followed.

9

## DISCUSSION

### I.    Standard of Review

We review de novo a grant of summary judgment and apply the same standard as the district court. *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019). This means we draw all reasonable inferences and resolve all factual disputes for the non-moving party. *Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1287 (10th Cir. 2022). We will affirm the grant of summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### II.    Discrimination

Title VII prohibits employment discrimination based on "race, color, religion, sex, or national origin." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). To succeed on this claim, a plaintiff "must prove that *intent* to discriminate *based upon* [the] plaintiff's protected class characteristics was the determining factor for the allegedly illegal employment decision." *Sanchez v. Phillip Morris, Inc.*, 992 F.2d 244, 246–47 (10th Cir. 1993) (emphasis in original); *see also Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1306 (10th Cir. 2005) ("[A] plaintiff must show that his employer intentionally discriminated against him for a reason prohibited by the statute.").

To prove a claim for discrimination, Ford may rely on either direct evidence of discrimination or use the three-step burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). Ford argues that she has evidence for both.

10

A.    **Direct Evidence**

"Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons." *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002). But evidence is direct only if it "proves the existence of a fact in issue without inference or presumption." *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 883 (10th Cir. 2018) (quoting *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007)). We note that in the employment context, this type of evidence is "usually impossible to obtain." *Twiggs v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1000 n.8 (10th Cir. 2011) (quoting *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 181 (2d Cir. 1992)).

Generally, "[c]omments in the workplace that reflect personal bias do not qualify as direct evidence of discrimination unless the plaintiff shows the speaker had decisionmaking authority and acted on his or her discriminatory beliefs." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013). And "discriminatory statements do not qualify as direct evidence if the context or timing of the statements is not closely linked to the adverse decision." *Id.*

Ford points to Bossert's derogatory statements as evidence of direct discrimination. Recall, Blanchette testified that he had heard Bossert call Ford and Funchess "resident street walkers," Appellant R. vol. 3 at 579, and Ford had learned that Bossert referred to her as a "Black bitch[] from Atlanta," Appellant R. vol. 2 at 374. Ford also cites evidence that during a managerial meeting about external-wholesaler positions, when Ford's name came up as a possible candidate, Bossert

11

laughed and said, "Let her try." Appellant R. vol. 3 at 587. Ford argues that these comments, combined with Bossert's alleged refusal to promote her, evidenced direct discrimination.

The district court disagreed for two reasons. First, it found that Ford "provides no evidence that Mr. Bossert actually made any promotion decisions." Appellant R. vol. 4 at 914. And because "comments by those who were not decisionmakers are irrelevant to [this] analysis," the court discounted Bossert's comments. *Id.* (citing *Tabor*, 703 F.3d at 1217). Second, the district court concluded that even if Bossert had decision-making authority, Ford's proffered evidence would still not qualify as direct evidence, because "Ford provides no direct evidence that he acted on his beliefs." Appellant R. vol. 4 at 915.

We need not consider the court's first ground for dismissal[5] because we agree with its second: even if Bossert had decision-making authority, Ford's evidence would still be insufficient to establish direct evidence of discrimination. This is because even though Bossert's comments may reflect "personal bias," Ford has identified no evidence that he refused to promote her because of her race or gender. *Tabor*, 703 F.3d at 1216.

We have previously outlined what type of evidence does not qualify as direct evidence of discrimination. In *Fassbender*, a plaintiff presented evidence that a health-services administrator expressed frustration at the news that the plaintiff and

---

[5] We discuss whether Ford has shown an issue of material fact about Bossert's decision-making authority below.

another employee were pregnant. 890 F.3d at 879. At some point, the administrator was heard telling her assistant, "I have too many pregnant workers. I don't know what I am going to do with all of them." *Id.* (brackets omitted). After the plaintiff was later fired, she argued that the administrator's negative comments about her employees' pregnancies was direct evidence of discrimination. *Id.* at 883.

We disagreed, explaining that because the administrator's comments were made "about a month before terminating" the plaintiff, there was no temporal proximity between the comments and the plaintiff's firing. *See id.* Nor did the comments suggest that the plaintiff's pregnancy had "somehow made her unqualified for her position." *Id.* So even though the comments may "reflect an animosity towards [a] protected group," we ruled that they did not "'demonstrate[] on [their] face that' the decision-maker acted on this nefarious motive." *Id.* at 883–84 (quoting *Danville*, 292 F.3d at 1249).

We have also described what is needed to show direct evidence of discrimination. In *Tabor*, a plaintiff interviewed for a job selling tools. 703 F.3d at 1213. Her interviewer "explicitly stated a view that women have inferior knowledge of tools and inferior ability to sell tools." *Id.* at 1217. Because these statements "spoke directly to central requirements of the job for which [the plaintiff] was interviewing" and were made "during a discussion about her fitness for the position," we held that there was a direct link between the statements and the decision not to promote the plaintiff. *Id.* As a result, the plaintiff had provided direct evidence of discrimination. *Id.*

The situation here is like *Fassbender*, not *Tabor*. First, Blanchette could not describe the timing or contexts in which Bossert made derogatory comments about Ford (and Funchess), such as their being "resident street walkers" and "Black bitches." Thus, unlike *Tabor*, no connection exists between these comments and the adverse employment action. Nor do the comments reflect any belief that Bossert thought that Ford's race or gender "somehow made her unqualified for the position." *Fassbender*, 890 F.3d at 883. So even though Bossert's comments may "reflect an animosity" towards a protected group, as did the administrator's comments in *Fassbender*, there is no evidence, "on its face," that he acted on his discriminatory beliefs. *Id.* at 883–84 (citation omitted). Our conclusion doesn't change even when considering Bossert's "Let her try" comment. That statement mentions neither Ford's race nor her sex. Thus, the comment doesn't "directly reflect[] the forbidden animus" needed for direct evidence of discrimination. *See Twiggs*, 659 F.3d at 1000 n.8.

In sum, Ford has not produced *direct* evidence of discrimination. But this doesn't doom her claim. She may still rely on the *McDonnell Douglas* burden-shifting framework to establish *indirect* evidence of discrimination.

**B.    Indirect Evidence**

The *McDonnell Douglas* test proceeds in three steps. *Fassbender*, 890 F.3d at 884. At the first step, the plaintiff must "raise a genuine issue of material fact on each element of the prima facie case, as modified to relate to differing factual situations." *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)). For a claim of race or sex

14

discrimination, a prima facie case requires evidence that: "(1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007) (stating standard for sex-based discrimination); *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021) (stating standard for race-based discrimination).

If the plaintiff establishes a prima facie case, at the second step, the burden then "shifts to the employer to offer a legitimate nondiscriminatory reason for its employment decision." *Bekkem*, 915 F.3d at 1267 (quoting *Morgan*, 108 F.3d at 1323). If the employer makes this showing, at the final step, the burden shifts back to the plaintiff to demonstrate that the employer's explanations were "pretextual—i.e., unworthy of belief." *Id.* (quoting *Morgan*, 108 F.3d at 1323).

Ford focuses her indirect-discrimination argument on two bases: (1) the failure to promote her, and (2) the discriminatory "terms and conditions" of her employment at Jackson. We address each in turn.

### a.    Failure to Promote

As for her failure-to-promote theory, Jackson concedes that Ford has satisfied her prima facie case. *See* Response Br. at 23. So we move straight to the second step of the *McDonell Douglas* analysis. Jackson must therefore articulate a legitimate, nondiscriminatory reason for not promoting Ford. *See Bekkem*, 915 F.3d at 1267. Jackson explained that Ford was not promoted because other candidates "performed

15

better" in interviews and were thus more qualified than her. Response Br. at 23. The district court concluded that Jackson had met its burden.

We agree with the district court. For example, Jackson points to the declarations of Robert Butler, Herbert May, and Greg Mahalich—all Jackson officials who selected candidates for promotional positions and interviewed Ford. Butler said that Ford was "unable to explain product specifications for a guaranteed fixed product" as one reason she "did not perform as well as the other candidates [he] interviewed." Supp. R. at 150–51. May, on the other hand, explained that he did not hire Ford because the other candidates "possessed better product knowledge and outperformed Ms. Ford in role playing and presenting products." Supp R. at 158. May also said that he preferred candidates "with a strong connection to, and deep knowledge of, the territory in question." Supp. R. at 158. Finally, Mahalich said that he hired one candidate over Ford, in part, because he felt that the candidate "was better suited to that particular territory at that time than Ms. Ford," given that the candidate "demonstrated excellent product knowledge," "was the most prepared of the candidates [he] interviewed," and "had the best understanding of what needed to be done." Appellant R. vol. 2 at 425. Mahalich added that he did not select Ford because another external wholesaler with whom Ford worked closely, Chris Silverstein, had told Mahalich that even though Ford "was excellent with mastering the technical details of various products, she was not a strong salesperson." Appellant R. vol. 2 at 426. Indeed, when Mahalich asked Silverstein how much of Ford's sales contributed to his sale numbers, Silverstein "said not at all." *Id.* These explanations

16

are all nondiscriminatory reasons for not promoting Ford. Thus, Jackson has satisfied its burden at the second step of the *McDonnell Douglas* framework.

So we move to the last step in the *McDonnell Douglas* analysis: pretext. To show pretext, the plaintiff must establish that the employer's proffered reasons "were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Bekkem*, 915 F.3d at 1267 (quoting *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006)). But "[m]ere conjecture that the employer's explanation is pretext[ual]" cannot defeat summary judgment. *Id.* (quoting *Morgan*, 108 F.3d at 1323).

Ford first argues that a reasonable jury could find that Jackson's explanations for hiring other candidates were pretextual. As an example, she points out that May "faulted Ms. Ford on her product knowledge, even though almost everyone, including Bossert, praised Ms. Ford's product knowledge." Opening Br. at 15–16. But even if others may have "praised" Ford's product knowledge, it does not follow that May's reason for hiring another candidate—because he had "better product knowledge"— was pretextual. Supp. R. at 158. Ford does not explain why May could not have believed this assessment in good faith. *See Jaramillo*, 427 F.3d at 1309 (finding that a jury could not find pretext based on an employer's explanation that another candidate was more qualified because the employer "could have believed in good faith that [another candidate] was at least as well qualified as" the plaintiff). Nor does she explain how May's reason was weak, incoherent, inconsistent, or contradictory in

17

any way. *Id.* at 1308. As a result, we see no reason why May's explanation for hiring someone other than Ford was "unworthy of credence." *Id.*

Ford also argues that Mahalich's reason for not choosing Ford because another candidate was "better suited to that particular territory" is "insufficient as a matter of law to justify summary judgment in Jackson's favor." Opening Br. at 16. First, Ford misconstrues the evidence. This was not Mahalich's only reason for choosing another candidate over Ford. He also said that the candidate he selected "was the most prepared," "demonstrated excellent product knowledge," and "had the best understanding of what needed to be done." Appellant R. vol. 2 at 425. Mahalich also said that Ford "was not a strong salesperson." Appellant R. vol. 2 at 426. Second, Ford does not explain why any of these reasons are "insufficient as a matter of law to justify summary judgment in Jackson's favor"—she merely cites *Jaramillo* without explanation. *See* Opening Br. at 16. But because Jackson articulated a nondiscriminatory reason for not promoting Ford, it was Ford's burden to show that a reasonable jury could find that Mahalich's reasons for not promoting Ford were not worthy of belief. She has not met that burden.

Still, Ford offers several other reasons why Jackson's reasons for not promoting her were pretextual. First, she argues that statistical evidence of Jackson's discriminatory practices demonstrates pretext. Second, she contends that Jackson's use of amorphous interviewing criteria also suggests pretext. Third, she argues that she was more qualified than any of the other candidates that were hired over her. We address each piece of evidence in turn.

i.    Statistics

"It is uniformly recognized that statistical data showing an employer's pattern of conduct toward a protected class can create an inference that an employer discriminated against individual members of the class." *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1114 (10th Cir. 2007) (quoting *Fallis v. Kerr–McGee Corp.*, 944 F.2d 743, 746 (10th Cir. 1991)). But not all statistical evidence is created equal. "Statistics taken in isolation are generally not probative of . . . discrimination." *Jones v. Unisys Corp.*, 54 F.3d 624, 632 (10th Cir. 1995). And we have said that when statistical evidence is "so flawed," it will be "insufficient to raise a jury question." *Doan v. Seagate Tech., Inc.*, 82 F.3d 974, 979 (10th Cir. 1996). Ford argues that between 2007 and 2010, 41 internal wholesalers were promoted to external wholesalers. Of those 41, 38 were white males, "2 were African American males, 1 was a white woman, and zero were African American females." Opening Br. at 17 (citing Appellant R. vol. 3 at 763). Ford also contends that the data shows that between 2007 and 2017, "no new female African Americans hires were promoted to [external wholesaler]." *Id.*

Having reviewed Ford's statistical data, we conclude that it is insufficient to raise a jury question. *See Doan*, 82 F.3d at 979. "[F]or statistical evidence to create an inference of discrimination, the statistics must show a significant disparity *and eliminate nondiscriminatory explanations for the disparity*." *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1147 (10th Cir. 2009) (emphasis added) (quoting *Fallis*, 944 F.2d at 746). Ford's evidence does not cross this threshold. First, Ford's numbers

19

"fail to provide any information regarding whether the decision not to hire [her], *and that decision alone*," involved discrimination. *Id.* (emphasis added). This is because her statistical evidence fails to account for other important variables such as "job performance, experience, and training." *Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1110 (10th Cir. 2008) ("Because the statistics fail to account for these variables, they do not constitute evidence of pretext.").

Second, we cannot infer pretext from a lack of African-American females being promoted to external-wholesaler positions between 2007 and 2017 and a lack of African-American females in internal-wholesaler positions being promoted to external-wholesaler positions between 2007 and 2010. As Jackson rightfully points out, Ford fails to "even identify a subset of individuals who applied" for these positions. Response Br. at 30. Without some "evidence regarding the number of . . . applicants, interviewees, and the like, the employment statistic is nearly meaningless." *Turner*, 563 F.3d at 1147; *see also LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 848 (1st Cir. 1993) ("[A] company's overall employment statistics will, in at least many cases, have little direct bearing on the specific intentions of the employer when dismissing a particular individual.").

Still, Ford argues that her statistics are meaningful because the fact that no member of a protected group has ever occupied a particular position suggests discrimination. This may be true "[u]nder certain circumstances." *See Marion v. Slaughter Co.*, 202 F.3d 282 (10th Cir. 1999) (table decision). But we have also rejected statistical evidence that shows "prolonged and marked imbalance . . . where

20

a legitimate reason for the employer's action is present." *Turner*, 563 F.3d at 1147 (quoting *Bauer v. Bailar*, 647 F.2d 1037, 1045 (10th Cir. 1981)).

For example, in *Turner*, a plaintiff argued that she was discriminated against. *Id.* at 1142. To support her claim, the plaintiff cited statistics that "from 1992 to 2005, no women were hired for entry-level positions at [her company] but twenty men were." *Id.* at 1146. We held that this evidence did not create an inference of discrimination, in part, because the plaintiff failed to acknowledge that when the company was hiring candidates, "the hiring pool included only two women." *Id.* at 1148. Here, Ford fails even to identify the number of people in the hiring pool. Thus, without some "evidence regarding the number of . . . applicants, interviewees, and the like," we can't infer discrimination. *Id.* at 1147.

In sum, no reasonable jury could infer pretext based on Ford's statistical data.

ii.    Subjective Criteria

Next, we consider whether Jackson's use of "amorphous" hiring criteria creates a triable issue of fact of pretext. To start, "a plaintiff cannot prove that [she] was discriminated against simply because an employment decision was based on subjective criteria." *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1275 (10th Cir. 2006). "We have long respected employers' wide latitude 'in setting job standards and requirements and in deciding whether applicants meet those standards.'" *Id.* (quoting *Hickman v. Flood & Peterson Ins., Inc.*, 766 F.2d 422, 425 (10th Cir. 1985)). And "*some* subjectivity is to be expected in every hiring decision." *Conroy v. Vilsack*, 707 F.3d 1163, 1177 (10th Cir. 2013) (emphasis in original).

21

This is not to say that the use of subjective hiring criteria cannot be evidence of pretext. It can be. *See Santana v. City & Cnty. of Denver*, 488 F.3d 860, 866 (10th Cir. 2007) ("[E]vidence of pretext may include the use of subjective criteria."). But "we 'typically' will infer pretext from the employers' use of subjective evaluation criteria in the hiring process 'only when the criteria on which the employers ultimately rely are *entirely* subjective in nature.'" *Conroy*, 707 F.3d at 1178 (emphasis in original) (quoting *Jones v. Barnhart*, 349 F.3d 1260, 1267–68 (10th Cir. 2003)).

Jackson has given *some* objective measurements for hiring candidates over Ford. For example, May preferred candidates "with a strong connection to, and deep knowledge of, the territory in question." Supp. R. at 158. Selecting candidates based on their familiarity with an area is an objective criterion. As another example, Mahalich chose not to hire Ford, in part, because he was told that she "was not a strong salesperson." Appellant R. vol. 2 at 426. This evaluation was not entirely subjective, given that the person who would be most knowledgeable about Ford's *measurable* sales numbers made that assessment. Finally, Butler chose not to hire Ford because she was "unable to explain product specifications for a guaranteed fixed product" as well as other candidates. Supp. R. at 150. That this skill "did not elicit measurable data" does not render the process wholly subjective. *See Turner*, 565 F.3d at 1146 (citing *Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1195 (10th Cir. 2006) to explain that an evaluation process which included

22

"subjective considerations" such as "team building, personal leadership, and personal accountability," did not render the process "wholly subjective").

In sum, Jackson's use of subjective hiring criteria does not allow us to infer pretext.

### iii.    Ford's Qualifications

Finally, Ford argues that she was "the most qualified candidate." Opening Br. at 17. Thus, she contends that any refusal to promote her must have been discriminatory.

Generally, we will infer pretext based on a comparison between a plaintiff's qualifications and those of successful applicants only when the plaintiff demonstrates an "overwhelming merit disparity." *Santana*, 488 F.3d at 865 (internal quotations and citation omitted). Put differently, we will infer pretext only when the plaintiff can "*assure us* that the plaintiff is better qualified than the other candidates for the position." *Id.* (emphasis added) (quoting *Barnhart*, 349 F.3d at 1267). Minor differences in qualifications will not demonstrate pretext because "it is not our role to act as a super personnel department that second guesses employers' business judgments." *Id.* (internal quotations and citation omitted).

Importantly, an employee's own belief that she was the most qualified candidate for a position is not enough to show pretext. *Hall v. Forest River, Inc.*, 536 F.3d 615, 620 (7th Cir. 2008) ("[A]n employee's own subjective belief that she is . . . more qualified than another applicant is insufficient."); *Rowell v. Bellsouth Corp.*, 433 F.3d 794, 799 (11th Cir. 2005) ("Rowell's personal belief that he was more

23

qualified is not sufficient to demonstrate discriminatory intent."). A plaintiff must do more than offer "mere self-serving appraisals." *Hall*, 536 F.3d at 620 (quoting *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 784 (7th Cir. 2007)).

Yet that is precisely the type of evidence that Ford mostly relies on. For example, she repeatedly points to exchanges in her own deposition testimony in which she merely declares that she's more qualified than other candidates. Take the following exchange from her deposition:

> Q: Sure. Did you compare your qualifications to the three people who got those positions?
>
> A: Yes.
>
> Q: And did you feel you were more qualified than them?
>
> A: Yes.
>
> Q: And what was the basis of your reason for that conclusion?
>
> A: I'm pretty sure the basis had to be my license designations, my experience dealing with clients, my experience in the industry, and also my experience at Jackson National.

Appellant R. vol. 2 at 491. The problem for Ford is obvious—despite her claims that she was more experienced, she presents no objective evidence of this fact. Ford doesn't explain how her license designations were superior to those of other candidates, how she knows that she had more experience with clients, or how any of the other candidates' experiences in the industry were inferior to hers. At bottom, she merely *believes* that she is more experienced. But without some objective evidence to

24

compare, there is no way for us to decide whether she truly had an "overwhelming

merit disparity." *Santana*, 488 F.3d at 865 (internal quotations and citation omitted).

Now take this other exchange:

Q: And relatively speaking, what were Tom's credentials as compared to yours?

A: Like I said, I had more experience. So it would be more experience in the financial services industry than Tom had.

Q: How much more experience did you have than Tom?

A: I don't know, but I know I had a lot more experience than he did.

Q: How did you know that?

A: Because I did the calculations when I looked at his FINRA report and my FINRA report, and it shows the time periods in which he worked and the time period in which I worked, and it also showed when he obtained his series licenses and when I obtained my . . . series licenses.

Appellant R. vol. 2 at 482.

The same problem exists here. Once again, Ford offers no objective evidence

for us to conclude that she had more experience than this candidate. Simply claiming

so—without supporting evidence—is insufficient to create a triable issue of material

fact.

We cannot simply take an employee at his or her word. In *Jones v. Denver

Post Corp.*, 203 F.3d 748 (10th Cir. 2000), *abrogated on other grounds by Nat'l R.R.

Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), we rejected a plaintiff's

discrimination claim because she "produced only generic and conclusory testimony

to support this allegation" that was "devoid of any specific instances of disparate

treatment." *Id.* at 756; *see also Wheeler v. BNSF Ry. Co.*, 418 F. App'x 738, 751 (10th Cir. 2011) (rejecting retaliation claim because the plaintiff "failed to provide the district court with sufficient objective evidence to support this allegation").

The same flaw permeates much of Ford's cited evidence. Even if she does have "a master's degree, FINRA certifications, numerous accolades, awards, and overall experience in the field," Reply Br. at 6–7, without objective documentation of her colleagues' qualifications to compare to hers, Ford cannot "assure us" that she is more qualified than the other candidates, *Santana*, 488 F.3d at 865 (quoting *Barnhart*, 349 F.3d at 1267).

Still, Ford argues that she does not rely only on her own opinions—she also points to the opinions of others. For example, she identifies the opinion of one of her supervisors, Brian Lane, who testified that Ford "was the most qualified person."[6] *See* Appellant R. vol. 3 at 614. And another one of her supervisors, Jeffrey Bauer, also said that she was "probably one of [the] best internal wholesalers that [he had] worked with." Appellant R. vol. 3 at 695. Ford contends that this evidence proves that she was indeed the most qualified candidate.

---

[6] Ford does cite deposition testimony from Lane, who stated that one worker was promoted over Ford even though "he did not go through any of the training programs that were in place at the time" and he did not "have any of the qualifications that she had for that position." Appellant R. vol. 3 at 613. But even accepting Lane's statement as true, Ford has still not presented sufficient evidence of pretext. This is because we, again, have no way to compare this candidate's qualifications to Ford's. Simply stating that she was more qualified is insufficient. With "no objective evidence" of this allegation, Ford's claim cannot overcome summary judgment. *See Denver Post*, 203 F.3d at 756.

It does not. In *Denver Post*, a plaintiff provided evidence from similarly situated employees who believed that the plaintiff was being unfairly treated. 203 F.3d at 756. Still, we upheld the dismissal of her claim because there was "no objective evidence of disparate treatment in the record." *Id.* And in any event, Lane's and Bauer's opinions about Ford demonstrate only that she was a strong candidate. But that fact has never been disputed. Indeed, Ford repeatedly made the shortlist and interviewed for many of these higher-ranking positions. But her supervisors' subjective belief that she "was the most qualified person" and "one of [the] best internal wholesalers" bears no insight into whether the other chosen candidates were viewed the same way.

With all this mind, Ford hasn't established such an "overwhelming merit disparity" over every other candidate. *Santana*, 488 F.3d at 865 (internal quotations and citation omitted). Thus, no reasonable jury could find that Jackson "didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda." *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1211 (10th Cir. 2010).

In sum, Ford has failed to demonstrate that Jackson acted with discriminatory intent in failing to promote her. So we affirm the district court's dismissal of this claim on this theory.

b.   *Terms and Conditions of Employment*

We turn now to Ford's argument that she was also discriminated against based on the terms and conditions of her employment. She argues: (1) that her supervisors

27

continually reassigned her territories to others and required her to train her colleagues, lowering her earning potential, and (2) that her supervisors treated her unfairly by giving her untimely or missed quarterly evaluations.

i.        Territory Assignments and Training

Ford contends that "Jackson manipulated its territories to [her] detriment so that her earning potential was unfairly decreased." Opening Br. at 20. According to Ford, Jackson would give territories that she had cultivated to her white, male coworkers, while giving her "less productive territories." *Id.* at 21. She also complains that Jackson forced her to "spend time training her coworkers" instead of "growing her business," which also lowered her earning potential. *Id.*

Jackson concedes that Ford's territories were realigned. But it explains that any realignment was due to a surge in work brought in from Merrill Lynch. This added responsibility led Jackson to add twelve new business-development consultants. So Jackson needed to "realign Ford's territory to accommodate these new [business development consultants]." Response Br. at 32. The district court concluded that, even if the reassignment of Ford's territories constituted an adverse employment action, Ford had "again failed to show that Jackson's rationale for changing its territories was pretextual." Appellant R. vol. 4 at 924.

We agree with the district court's conclusion, but for a different reason—we conclude that Ford hasn't produced sufficient evidence that the realignment of her territories amounted to an adverse employment action. Thus, Ford hasn't made a prima facie case of employment discrimination based on the realignment of her

28

territories. *See PVNF*, 487 F.3d at 800 (identifying the prima facie elements as:

"(1) the victim belongs to a protected class; (2) the victim suffered an adverse

employment action; and (3) the challenged action took place under circumstances

giving rise to an inference of discrimination").

We acknowledge that Ford's burden at the prima facie stage "is not onerous."

*Orr v. City of Albuquerque*, 417 F.3d 1144, 1152 (10th Cir. 2005). We also recognize

that an adverse employment action is not limited to "monetary losses in the form of

wages or benefits." *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1279 (10th Cir.

2010) (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998)).

But at the same time, "a mere inconvenience or an alteration of job responsibilities"

does not qualify. *Id.* (quoting *Sanchez*, 164 F.3d at 532). Generally, an adverse

employment action is a "significant change in employment status, such as hiring,

firing, failing to promote, reassignment with significantly different responsibilities,

or a decision causing a significant change in benefits." *Id.* (quoting *Hillig v.

Rumsfeld*, 381 F.3d 1029, 1032–33 (10th Cir. 2004)).

Here, Ford lacks "objective evidence of material disadvantage." *Wheeler*, 418

F. App'x at 751 (citation omitted); *see also Denver Post*, 203 F.3d at 756 (rejecting

discrimination claim because the plaintiff failed to produce "objective evidence of

disparate treatment"). Even assuming her salary was indeed negatively affected by

the realignments, she presents no evidence to support her allegation beyond her own

affidavit and deposition transcript to show that her white, male colleagues' salaries

29

weren't also adversely affected.[7] For example, when explaining how her territories were taken away, Ford states: "I *feel* that those individuals were given territories that I actually grew and given me the less portion of that territory that had no sales coming in." Appellant R. vol. 2 at 507 (emphasis added). But her personal belief is insufficient to create an issue of material fact. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1408 n.7 (10th Cir. 1997) (citing *Hanson v. City of Okla. City*, 37 F.3d 1509 (10th Cir. 1994) (table opinion) to note that "plaintiff's subjective belief of discrimination was insufficient to preclude summary judgment").

In any event, even if Ford had presented a prima facie case, she has failed to demonstrate pretext. This is because Ford has not sufficiently shown that Jackson's reason for reassigning Ford's territories—to accommodate the new business-development consultants—was "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Bekkem*, 915 F.3d at 1268 (quoting *Young*, 468 F.3d at 1250).

For the same reasons, Ford has failed to present either a prima facie case or evidence of pretext that she was being unfairly required to train her colleagues. As Jackson explains, "training and mentoring were part of [Ford's] responsibilities after being elevated to [business-development consultant]." Response Br. at 32. Outside of her own affidavit and deposition again, Ford presents no evidence that she was being

---

[7] When asked about her basis for alleging that "sales territories were not adjusted for White males," Ford merely asserts "[v]isual observation" based on internal emails. Appellant R. vol. 2 at 508. Yet she fails to direct us to this evidence in any of her briefing.

asked to train other employees at a higher rate than her white, male coworkers.

Indeed, she merely asserts that she "*noticed* that this did not happen to [her] white

and male colleagues." Appellant R. vol. 2 at 468 (emphasis added). But this evidence

lacks "objective evidence of material disadvantage." *Wheeler*, 418 F. App'x at 751

(citation omitted). Thus, a jury could not have reasonably found that Ford's training

requirements "constituted [a] materially adverse action." *Id.* Even accepting her

prima facie case, Ford fails to explain why Jackson's reason for having her train her

colleagues—it's an aspect of her job—was "unworthy of belief." *Bekkem*, 915 F.3d at

1268 (quoting *Young*, 468 F.3d at 1250).[8]

In sum, Ford has failed to show that the realignment of her territories or her

requirement to train others was discriminatory. We affirm the dismissal of her

discrimination claim on these theories.

### ii.        Untimely Evaluations

Ford contends that Walker gave her late quarterly evaluations as compared to

those given to her white, male coworkers. Or he would fail to evaluate her altogether.

---

[8] Ford contends that her unfair treatment was so obvious that even her other supervisor, Lane, noticed. *See* Opening Br. at 22. But Ford takes this evidence out of context. True, Lane did state that he believed that Walker was unfairly evaluating Ford. Appellant R. vol. 3 at 619 ("Q: Do you believe that Mr. Walker was fairly evaluating Ms. Ford? A: No."). But Lane's statement had nothing to do with the realignment of Ford's territories, or her being asked to train her colleagues. Instead, Lane made this statement in relation to Walker's decision to give an award to another worker over Ford. *See* Appellant R. vol. 3 at 620 (Lane explaining that Walker "really wanted Jeremiah to win this particular award but never was able to necessarily articulate what it was, the why other than that's who he wanted"). As a result, this evidence has little bearing on pretext for this claim.

Ford argues that her delayed evaluations let her coworkers get a head start on what they needed to improve upon, while she fell behind.

The district court found that these untimely or missing evaluations did not even amount to an adverse employment action. Thus, Ford failed to establish a prima facie case of discrimination.[9]

As stated above, an adverse employment action must amount to more than "a mere inconvenience or an alteration of job responsibilities." *Jones*, 617 F.3d at 1279 (quoting *Sanchez*, 164 F.3d at 532). Thus, it generally requires a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (quoting *Hillig*, 381 F.3d at 1032–33).

On this ground, Ford has failed to demonstrate that she suffered an adverse employment action. First, she has provided insufficient evidence that she received later evaluations than her coworkers—she cites only her deposition without any other supporting evidence. Once again, this is insufficient to create an issue of material fact. *See Denver Post*, 203 F.3d at 756 (rejecting discrimination claim because the plaintiff had produced "no objective evidence of disparate treatment in the record"); *see also Wheeler*, 418 F. App'x at 751 (dismissing claim because the plaintiff "failed

---

[9] The court later found that even if it accepted that these untimely evaluations qualified as an adverse employment action, Ford had still failed to show that Jackson's explanations were pretextual. We need not analyze whether the court's conclusion was correct because, as we will explain, Ford hasn't satisfied her burden at the first step of the *McDonnell Douglas* analysis.

to provide the district court with *sufficient objective evidence* to support this allegation" because "the only evidence she cited in support of this allegation was her own deposition transcript" (emphasis added)).

Even ignoring Ford's lack of evidence, she doesn't explain how her coworkers being given quarterly evaluations before her amounts to anything more than "a mere inconvenience." *Jones*, 617 F.3d at 1279 (quoting *Sanchez*, 164 F.3d at 532). Nor does she describe how these untimely or missed evaluations caused a "significant change in employment status." *Id.* (quoting *Hillig*, 381 F.3d at 1032–33). As a result, we agree with the district court that she has failed to make out a prima facie case of discrimination.

In sum, we affirm the district court's dismissal of Ford's discrimination claim.

## III. Retaliation

Next, we consider the district court's dismissal of Ford's retaliation claim. Like a claim for discrimination, a plaintiff may prove retaliation by either direct evidence or through the *McDonnell Douglas* burden-shifting framework. *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1201 (10th Cir. 2008).

Here, Ford argues that she has presented a prima facie case of retaliation. So we consider her arguments under the *McDonnell Douglas* framework. To establish a prima facie case, "an employee must establish (1) he or she engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection exists between the

protected activity and the materially adverse action." *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007).

Jackson doesn't contest that Ford "engaged in protected opposition to discrimination." *Id.*; *see* Response Br. at 36. So we proceed to the next two elements: the adverse employment action and causation. Ford points to three employment actions: (1) the failure to promote her; (2) receiving the PIP; and (3) the realignment of her territories. *See* Opening Br. at 26, 29. We consider each in turn.

## A.    Failure to Promote

The district court rejected Ford's failure-to-promote claim for the same reasons that it rejected her discrimination claim—that she had failed to show pretext. *See* Appellant R. vol. 4 at 928 ("The Court has already explained that Ms. Ford has failed to prove pretext in Jackson's promotion decisions, and, therefore, the Court need not re-address Ms. Ford's retaliatory failure-to-promote claims.").[10]

We disagree with the district court. The failure of a discrimination claim is not necessarily fatal to a retaliation claim. Indeed, we have said that "[a] meritorious retaliation claim will stand even if the underlying discrimination claim fails." *Sanchez*, 164 F.3d at 533.

One key piece of evidence differentiates Ford's retaliation claim from her discrimination claim: the September 2010 email exchange between Bossert and

---

[10] Neither party appears to dispute the first or second step of the *McDonnell Douglas* analysis.

Stone. Recall, Bossert had learned that Ford had "posted for the vacant desk director position in RBD East." Appellant R. vol. 3 at 661. Based on Ford's application to this position, Bossert told Stone that "[he] firmly believe[s] that she would attempt to leverage that position into an opportunity to work against the company's interest *by furthering her complaint*." Appellant R. vol. 3 at 661 (emphasis added). Unsurprisingly, Ford was not offered this position.

Ford has presented sufficient evidence of pretext.[11] The email demonstrates— on its face—that Bossert didn't want to promote Ford, because she would use that opportunity to "further[] her complaint." Appellant R. vol. 3 at 661. A reasonable jury could view this evidence to find that Jackson's true motivation for not promoting Ford was retaliatory in nature. *See Gosset v. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1177 (10th Cir. 2001) ("A plaintiff demonstrates pretext either by showing that a *discriminatory reason more likely motivated the defendant's decision* or that the employer's proffered explanation is unworthy of belief." (emphasis added)).

And this is not Ford's only evidence supporting pretext. Bossert also allegedly told Blanchette that Ford "would not become an external" because "she was causing

---

[11] Ford characterizes this evidence as indirect evidence of retaliation. *See* Opening Br. at 29–30 ("Because Ms. Ford did present evidence demonstrating a genuine issue of material fact whether Jackson's reasons for not promoting her . . . , the District Court failed to conduct a complete *McDonnell Douglas* analysis."). We need not decide whether Ford's proffered evidence constitutes direct or indirect evidence because, regardless of its characterization, we conclude that a reasonable jury could find based on this evidence that Jackson retaliated against Ford by not promoting her.

far too much problems." Appellant R. vol. 3 at 584. On top of that, Bossert also laughed and replied, "Let her try" when discussing Ford's candidacy for an open external-wholesaler position. Appellant R. vol. 3 at 587. This evidence erodes whatever explanation Jackson had for not promoting her, because the evidence supports Ford's assertion that she would never be promoted—no matter what she did. When read alongside the email evidence, a jury could conclude that Jackson had no intention of ever promoting Ford because of her previous complaints.

But Jackson argues that we should put no stock into Bossert's comments because he wasn't involved in the hiring of external wholesalers. According to Jackson, Bossert's influence in the promotion process extended only to recommending those to the shortlist—and Ford made that list multiple times. Said another way, Jackson argues that "Ford *succeeded* through the stages of the process with which evidence indicates Bossert was involved." Response Br. at 21.

We disagree with Jackson. Even though Ford may have made the shortlist for these positions, she has produced evidence that Bossert's influence extended beyond just recommending those who qualified for the shortlist. For example, Traci Reiter, another Jackson employee, testified that when deciding who would be promoted, one executive would ask, "Hey, you know, who does Jim Bossert suggest[?]" Appellant R. vol. 2 at 395. And that executive would solicit Bossert's advice about candidates who were *already* on the shortlist. *Id.* ("Q: So all of these people would have had to have been on the short list at that time? A: Yes, I would assume so."). As another example, Ford also testified that Bossert had to approve any promotion. *See*

36

Appellant R. vol. 2 at 340 ("[I]f the internal was coming from the desk, they have to also have approval from that desk director or that national sales manager, which was James Bossert."). This assertion is supported by Blanchette's testimony that Bossert participated in roundtable meetings about who should be promoted to external wholesalers. At minimum, Ford has raised a triable issue of fact about whether Bossert had decision-making authority for promotions. To make it past summary judgment, that is all that is required.

In short, a reasonable jury could view this evidence and find that Jackson's reasons for not promoting Ford were pretext for retaliation. Thus, we reverse the dismissal of Ford's retaliation claim based on her failure-to-promote theory.

### B.    Performance-Improvement Plan

Next, Ford argues that she was retaliated against when she was placed on a PIP. In our circuit, "a PIP, standing alone, is not an adverse employment action." *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1224 (10th Cir. 2006). Still, a PIP "*may* be an adverse employment action . . . if it effects a significant change in the plaintiff's employment status." *Id.* (emphasis in original).

The district court concluded that there was a triable issue of material fact whether the PIP here constituted an adverse employment action because, at Jackson, "employees on PIPs cannot be promoted." Appellant R. vol. 4 at 927; *see also* Appellant R. vol. 2 at 519 ("Q: And for the three months that Mr. Poole was under this performance improvement plan in August of 2013, Exhibit 30, was he eligible to seek promotions? . . . . A: Not while he was on the document."). But the district court

37

still determined that Ford hadn't established a prima facie case of retaliation on this theory because she had failed to establish a causal connection between her protected activity and the imposition of the PIP.

We agree with the district court. First, Ford's protected activity, like her EEOC complaint and four-page letter to HR, *post*-dated the PIP. *Compare* Appellant R. vol. 2 at 429 (stating that the date of the PIP was September 10, 2009) *with* Appellant R. vol. 4 at 949 (stating that the date of her first EEOC complaint was on December 7, 2009); Supp. R. at 144 (stating date of her four-page complaint to HR as September 11, 2009). Because Ford's protected activity occurred after Walker imposed the PIP, she cannot maintain her retaliation claim on this basis.[12] *See Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1226 (10th Cir. 2016) (explaining that there was no causal connection between an employer's decision to not hire a plaintiff and the assertion of the plaintiff's ADA rights because the employer had decided not to hire a plaintiff *before* learning of the plaintiff's ADA rights).

But Ford maintains that there is still a causal connection between other protected activity—such as her complaints to her supervisors, like Lane, about her treatment—because those occurred *before* the PIP. But this evidence cuts against her,

---

[12] Nor can Ford rely on Bossert's alleged instruction to Blanchette to fire her. These comments had to have occurred *after* Blanchette became Ford's supervisor, which did not occur until November 2009—two months after the PIP. *See* Appellant R. vol. 2 at 351 (Ford stating that upon completion of HR's investigation into her four-page complaint, which occurred in November 2009, *see* Appellant R. vol. 2 at 429, she was "now reporting to [Robert] Blanchette").

not for her. As Ford admits, Lane "stopped working for Jackson in December of 2008, *some nine months before the PIP*." Reply Br. at 9 (emphasis added). A nine-month difference between the protected activity and the alleged adverse employment action is too long of a time, on its own, to establish any causal connection. *See Bekkem*, 915 F.3d at 1271 ("[A] three-month gap between protected activity and an adverse action is too long to support an inference of causation on its own."). And given the timing between Bossert instructing Blanchette to fire Ford and Ford's complaints to the EEOC and to HR, we can infer only that Bossert's comments were made in response to those complaints, and not Ford's earlier complaints to Lane. *See* Appellant R. vol. 3 at 580 (stating that "in late 2009 Mr. Bossert had instructed [Blanchette] to terminate" Funchess and Ford).

As a result, we affirm the district court's dismissal of Ford's retaliation claim based on the PIP.

### C.    Realignment of Territories

Finally, we consider the district court's dismissal of Ford's retaliation claim based on the realignment of her territories. For the same reasons we explained in the discrimination section—that Ford had failed to demonstrate that the realignment of her territories even amounted to an adverse employment action—we conclude that the district correctly dismissed this claim.

## IV.    Hostile Work Environment

Next, we turn to Ford's claim for hostile work environment, which she alleges was based on her race and sex.

39

### A.    Aggregation of Racial and Sexual Hostility

Before reaching the merits of her claim, we address Ford's argument that the district court erred by treating her allegations of race- and sex-based hostility as separate hostile-work-environment claims, rather than aggregating them into a single claim.

We have not addressed this question head-on. But in *Hicks v. Gates Rubber Co.*, 833 F.2d 1406 (10th Cir. 1987), we considered whether "a trial court *may* aggregate evidence of racial hostility with evidence of sexual hostility." *Id.* at 1416 (emphasis added). We held "that such aggregation is *permissible*." *Id.* (emphasis added). But we did not mandate that courts do so. *See id.* Nor, post-*Hicks*, have we reversed when a court has treated these claims separately. *See, e.g.*, *Chavez v. New Mexico*, 397 F.3d 826, 831–32 (10th Cir. 2005) (separating racially hostile work environment claim from sex-based harassment).

In addition, we note that Ford raised these as separate claims in her complaint. And she discussed them separately in her summary-judgment briefing. We can thus hardly fault the district court for doing the same. In sum, the district court did not err by treating Ford's race- and sex-based claims as distinct claims.

### B.    Merits

We now turn to the merits. For this claim to survive summary judgment, Ford must first show that Jackson discriminated against her because of her race and sex. *See Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1174 (10th Cir. 2020) (sex-based hostility); *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir.

2012) (race-based hostility). Second, she must demonstrate "that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of [her] employment and created an abusive working environment." *Sanderson*, 976 F.3d at 1174 (quoting *Medina v. Income Support Div.*, 413 F.3d 1131, 1134 (10th Cir. 2005)).

To prove severity or pervasiveness, a plaintiff must subjectively and objectively perceive the harassment. *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1252 (10th Cir. 2021). This means the plaintiff must: (1) subjectively perceive "the conduct to be severe or pervasive," and (2) "show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult." *Id.* (quoting *Sanderson*, 976 F.3d at 1176). We analyze severity and pervasiveness by looking at the totality of the circumstances and "consider such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012). "'[A] few isolated incidents' of discriminatory conduct" and "run-of-the mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces" are insufficient to support a claim for hostile work environment. *Throupe*, 988 F.3d at 1252 (quoting *Morris*, 666 F.3d at 664). With that in mind, whether conduct qualifies as severe or pervasive is "particularly unsuited for summary judgment because it is quintessentially a question

41

of fact." *Hernandez*, 684 F.3d at 958 (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)).

### a.    Sex-Based Hostility

We start with whether Ford has provided sufficient evidence of a sex-based hostile work environment. But before reaching the merits of this claim, we must first determine whether the district court erred in failing to consider the vodka-bottle incident from January 2008 and the football defacement from October 2010 as part of Ford's work environment. We conclude that the district court erred in refusing to consider the former, but correctly rejected consideration of the latter.

We then consider whether the vodka-bottle incident, along with Ford's other evidence, supports a claim for a hostile work environment. As we explain below, a reasonable jury could find that Jackson maintained a sex-based hostile work environment.

### i.    *Vodka-Bottle Incident*

Recall that at a Jackson off-site work party in 2008, Ford alleges that one of Jackson's vice-presidents, John Poulsen, held a vodka bottle horizontally in his pelvic region, thrusted at her, and told Ford to "get on [her] knees." Appellant R. vol. 2 at 501. This so humiliated Ford that she left the party. Ford argues that this incident was more evidence of the sex-based hostility that she endured at Jackson. Jackson, on the other hand, argues that this conduct occurred outside the limitations period and bears no relationship to the other type of conduct she complains of, so we need not consider it as part of her claim.

42

Generally, Title VII discrimination claims require a plaintiff "to file a claim within 300 days of the alleged discriminatory conduct." *Duncan v. Manager, Dep't of Safety, City and Cnty. of Denver*, 397 F.3d 1300, 1308 (10th Cir. 2005) (citing 42 U.S.C. § 2000e-5(e)(1)). But for claims of hostile work environment, "this requirement has proven problematic" because these claims "often involve a series of incidents that span a period longer than 300 days." *Id.*

In addressing this problem, the Supreme Court has explained that "[i]t does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). What matters is that there is "an act contributing to the claim [that] occurs within the filing period." *Id.* If there is, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability," *id.*, as long as "the acts about which an employee complains are part of the same actionable hostile work environment practice," *id.* at 120.

An event is part of the same hostile work environment when "the pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Id.* (alteration in original) (citation omitted). But these factors aren't exhaustive. *Hansen v. SkyWest Airlines*, 844 F.3d 914, 923 (10th Cir. 2016). "*Morgan* 'does not limit the relevant criteria or set our factors or prongs.'" *Id.* (quoting *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010)). We must remain flexible "in a

context as fact-specific and sensitive as employment discrimination and as amorphous as hostile work environment." *Id.* (quoting *McGullam*, 609 F.3d at 77).

Here, the vodka-bottle incident occurred in January 2008, and Ford filed her first EEOC charge on December 7, 2009. Thus, the vodka-bottle incident, on its own, falls outside the 300-day limitations period. But that doesn't end our inquiry. We may still consider the incident if it is sufficiently like Ford's other sex-based complaints, such that it may be considered part of the "the same actionable hostile work environment practice."[13] *Morgan*, 536 U.S. at 120. The district court found that "there [was] no indication that the vodka-bottle incident . . . is related to or part of any course of conduct connected with the other incidents that Ms. Ford cites." Appellant R. vol. 4 at 933–34.

We disagree. We have previously concluded that "because [certain] instances of harassment [were] related by type, perpetrator, and location . . . the district court was wrong not to consider them as part of the same actionable hostile work environment practice." *Hansen*, 844 F.3d at 924. Ford complained that Jackson fostered a work environment that condoned the type of behavior where its workers could openly discuss "[g]irls gaining weight, [and the] size of their breasts,"

---

[13] We note that Ford doesn't specify the dates on which she experienced sexually harassing comments. But she does allege that these comments occurred "on a daily basis with impunity." Appellant R. vol. 2 at 467. And Jackson doesn't argue that no sexually harassing comments were made within the 300-day limitations period. Instead, Jackson argues only that we can't consider the vodka-bottle incident because "it is unrelated to any of the other incidents Ford raises as part of the alleged hostile work environment." Response Br. at 47.

Appellant R. vol. 3 at 729; where its male employees would make comments about "female genitalia resembling roast beef," Appellant R. vol. 2 at 543; and where its employees could accuse their female coworkers of "trying to have sex with . . . advisors at different points," Appellant R. vol. 3 at 707. Even if Poulsen was not the same manager and this incident occurred only once, asking someone to "get on her knees" and thrusting a bottle at her is the same type of sex-based hostility that Ford has repeatedly complained of. And given that we must remain flexible in making such assessments, at the very least, Ford has "demonstrated a triable issue as to whether [the vodka-bottle incident] . . . constituted 'the same actionable hostile work environment practice.'" *Hansen*, 944 F.3d at 924.

Thus, the district court erred by disregarding this incident from its analysis.

### ii.    *Defaced-Football Incident*

We turn now to the defaced-football incident. Recall, after Ford had given Jackson her two-week notice, two of her coworkers threw a football at her. But the football had been defaced. It originally read "Black Rock," but the "R" was changed to a "C." Appellant R. vol. 2 at 297. Ford reported the incident to Stone and refused to complete her last two weeks at the company.

The district court found that this evidence wasn't relevant because it "did not alter the terms or conditions of her employment such that it could create or contribute to a triable issue of Title VII liability," given that Ford "had already tendered her resignation." Appellant R. vol. 4 at 937.

45

We agree that the district court need not consider this incident—but for a different reason. We focus on the fact that an employer is liable for a claim of hostile work environment only "if it knew, or should have known, about the hostile work environment *and failed to respond in an appropriate manner*." *Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1270 (10th Cir. 1998) (emphasis added). After Jackson told Stone about the defaced-football incident, Stone flew to Denver and fired the two workers involved. Jackson then held a meeting with about 400 people in the Denver office to reinforce that such behavior would not be tolerated at the company. And on top of all that, Jackson's president also wrote a letter apologizing to Ford. Ford doesn't explain what more Jackson should have done.

Thus, because Jackson "respond[ed] in an appropriate manner," for this incident, we have no need to consider this incident as part of hostile-work-environment claim. *Id.*

### iii.    *Ford's Other Evidence*

We now turn to whether Ford's other evidence supports her claim. It does. To start, Ford identified evidence that she was repeatedly asked sexually explicit questions. Appellant R. vol. 4 at 950 ("Crosby has also asked me, 'How big are your boobs?'"). She also alleged that Walker "allowed offensive racist and sexist remarks on the sales desk to be made on a daily basis with impunity." Appellant R. vol. 2 at 467. Ford cites the testimony of several female Jackson employees who agreed that the "constant . . . sexual banter" at Jackson was "degrading." Appellant R. vol. 3 at 718. They testified that male employees regularly commented about "how tight their

46

clothes were . . . girls gaining weight, [and the] size of their breasts." Appellant R.

vol. 3 at 729. Indeed, sexually explicit conversations were apparently so frequent at

Jackson that one employee said, "it would be easier to list [the employees] who

didn't participate than the ones who did." Appellant R. vol. 3 at 707.

On these facts, a reasonable jury could find that Jackson maintained a work

environment that was "sufficiently severe or pervasive such that it altered the terms

or conditions of her employment and created an abusive working environment."

*Sanderson*, 976 F.3d at 1174 (quoting *Medina*, 413 F.3d at 1134). In fact, the district

court agreed. It found that Ford had raised a genuine dispute of material fact about

"whether the conduct was sufficiently pervasive to create an actionably hostile work

environment." Appellant R. vol. 4 at 934.

Yet the district court still dismissed Ford's claim because it did not "find a

genuine dispute as to the severity of the sexual comments that [] Ford experience[d]."

*Id.* The court explained that this behavior fell "short of the severity necessary to meet

the hostile work environment test of 'intimidation, ridicule, and insult' sufficient to

alter the conditions of an employee's employment." Appellant R. vol. 4 at 935.

On this point, the district court erred. "Proof of *either severity or*

*pervasiveness can serve as an independent ground* to sustain a hostile work

environment claim." *Throupe*, 988 F.3d at 1252 (emphasis added). So once the court

determined that there was a genuine dispute about the pervasiveness of the hostile

47

work environment, it didn't need to also find severity for Ford's claim to survive summary judgment.[14]

### iv.    Jackson's Counterarguments

Jackson argues that this claim should still be dismissed for three reasons. First, it contends that there is no evidence that these comments affected the conditions of Ford's employment given that "the record reflects that [she] progressed through the ranks of Jackson." Response Br. at 42. Second, Jackson insists that Ford's reliance on the testimony of other women cannot support her claim. Finally, Jackson argues that Ford never subjectively perceived this harassment.

### 1.  Effect on Ford's Employment

Jackson contends that because Ford continued to progress through its ranks, the conditions of her employment weren't affected for the worse. But "the law does not require a plaintiff to show that the discriminatorily abusive work environment seriously affected her psychological well-being, *or that it tangibly impaired her work performance*[.]" *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998) (emphasis added) (internal citation omitted). "The criterion is not what a reasonable woman employee is capable of enduring, but whether the offensive acts alter the conditions of employment." *Id.* (original emphasis removed) (quoting *Dey v. Colt*

---

[14] The court also ruled that Ford's claim failed "because there [was] no dispute that [these] comments did not interfere with Ms. Ford's work performance," given that she became a business-development consultant, completed boot camp, and made the short list for external wholesaler positions. *See* Appellant R. vol. 4 at 935. We address that argument below.

*Constr. & Dev. Co.*, 28 F.3d 1446, 1455 (7th Cir. 1994)); *see also Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) ("[T]he test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*.'" (emphasis in original) (citation omitted)). At bottom, a victim's ability to succeed at her job in the face of harassment should not then mean that she has forfeited her right to bring a claim for hostile work environment. *See Gabrielle M. v. Ill. Sch. Dist. 163*, 315 F.3d 817, 828 (7th Cir. 2003) (Rovner, J., concurring) ("[W]e have repeatedly rejected the notion that a victim's ability to keep doing her job in the face of harassment will defeat her contention that the workplace was hostile.").

Thus, we need only ask whether a reasonable jury could find that Ford's condition of employment was altered for the worse because of these sex-based harassment. As we've already explained, the answer is yes. So the fact that Ford continued to progress at Jackson is no reason for us to dismiss her claim for hostile work environment.

### 2. Testimony of Other Women

Next, Jackson insists that Ford's evidence is insufficient to support her claim because she "relies heavily on testimony from other Jackson employees to support her claim." Response Br. at 42. This fact, Jackson contends, is insufficient to support her claim because "generalized testimony about sexual banter, not anchored in time or place, or attributed to any particular speaker cannot support a hostile work environment." Response Br. at 44.

49

We disagree with Jackson's characterization of the evidence. First, "[a] hostile work environment claimant need not establish precise dates for every insult." *Nettle v. Cent. Okla. Am. Indian Health Council, Inc.*, 334 F. App'x. 914, 921 (10th Cir. 2009). "After all, the point of such claims is that the discrimination was ongoing and pervasive, that is, *all the time*, and not at isolated points in time." *Id.* (emphasis in original).

Second, in making this argument, Jackson ignores Ford's other evidence. Ford has supplied evidence that she was subjected to sexual harassment as seen by her complaints to the EEOC, to her supervisors, and to HR. The testimony of these other women was just more evidence to support her claim. And we've held that evidence directed at others—who are not the plaintiff—is relevant in this analysis. *See Hicks*, 833 F.2d at 1415 ("Evidence of a general work atmosphere therefore—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim."); *see also Hernandez*, 684 F.3d at 959 ("[W]e have held that derogatory comments need not be directed at or intended to be received by the victim to be evidence of a hostile work environment.").

In sum, Ford did not rely solely on the testimony of women to support her hostile-work environment claim. Ford used this evidence to supplement her other evidence. Thus, Ford has presented sufficient evidence of a sex-based hostile work environment.

### 3.  Subjective Perception

Next, we consider Jackson's argument that Ford never subjectively perceived her harassment as sufficiently severe or pervasive. Jackson argues that because Ford's four-page complaint to HR only has a "brief aside" about the hostile work environment—"[internal wholesalers] are allowed to have open racial and sexual discussions without reprimand"—as compared to her "several pages of detailed complaints" of other conduct at Jackson, Ford did not subjectively perceive her work environment to be sufficiently severe or pervasive to support her claim. Response Br. at 45. Jackson also contends that "Ford's silence on any alleged comments" suggests that she did not subjectively perceive her work environment to be hostile. Response Br. at 46.

Once again, we disagree with Jackson. First, Jackson cites no case to support its argument that we should dismiss a claim for hostile work environment based on the amount of detail an employee fails to include *in an actual complaint she filed with the company*. That Ford included the allegation at all should be enough. Second, Ford was not silent about her complaints. She told Blanchette that her coworkers would talk about her breasts and throw items at her. And in her EEOC complaints, she details the type of racial and sexual harassment she experienced at Jackson. This includes racist jokes and her being asked sexually explicit questions. *See* Appellant R. vol. 4 at 950 (accusing Jackson employees of having "openly racist and sexual discussions").

51

Thus, Ford has presented sufficient evidence that she subjectively perceived her work environment to survive summary judgment.

b.      Race-Based Hostility

Next, we turn to the race-based allegations of hostile work environment at Jackson. The district court rejected this claim for two main reasons. First, it concluded that though Ford complains that Bossert and other managers called her derogatory names—such as "bitches," "divas," "resident streets walkers," "Black bitches from Atlanta," and "Black Panthers"—Ford had "not alleged that she heard these comments." Appellant R. vol. 4 at 936 (internal citation omitted). This meant, according to the court, that Ford had failed to "establish a genuine dispute that such conduct unreasonably interfered with Ms. Ford's work performance, or that the environment at Jackson was both objectively and subjectively hostile." *Id.* Second, the court determined that a white coworker's use of the n-word in front of Ford while telling a story was not done with racial animus, such that its use alone created a hostile work environment. As a result, when viewing its use "in the context of other, overtly racially discriminatory conduct," the court concluded that Ford had experienced "isolated incidents of racial enmity or sporadic racial slurs" that were "insufficient to establish a triable issue of fact of a hostile work environment." Appellant R. vol. 4 at 937.

We start with the district court's first reason for dismissal—that Ford had not heard these derogatory names. We conclude that the court erred in arriving at this conclusion. The court is correct that a plaintiff "may only rely on evidence relating to

52

harassment of which she was aware *during the time she was allegedly subject to a hostile work environment.*" *Creamer v. Laidlaw Transit, Inc.*, 86 F.3d 167, 171 (10th Cir. 1996) (emphasis added) (citation omitted). And the court is also correct that Ford admits that she didn't hear *some* of Bossert's comments until after she left Jackson. Appellant R. vol. 4 at 975 ("*After I left*, I have since been made aware that Ms. Funchess and I were also referred to as 'pieces of shit,' and 'Black Panthers,' and Jackson's 'resident street walkers.'" (emphasis added)).

But that doesn't mean that Ford was unaware of all the derogatory names she was called. Indeed, she has stated that "*While [she] worked for Jackson*, [she] was called 'black bitch' several times, *and [she] knew that* [] Ms. Funchess and [her] were referred to as 'black bitches from Atlanta' and that Bossert referred to us as Jackson's 'Black Panther Party.'" Appellant R. vol. 4 at 975 (emphasis added). Even if Ford did not personally hear these comments, she testified that she heard about these comments while she worked at Jackson. In fact, that is how Ford said that she learned about the "Black bitches from Atlanta" comment. *See* Appellant R. vol. 2 at 374 ("A: I know [Bossert] made one of these statements calling us Black bitches from Atlanta, he made that in a . . . supervisor's meeting where [Funchess] was not present, but Al Gannaway was. Q: Did Al tell you about what Mr. Bossert said? A: Yes, he did . . . . Q: It's when you were working in Denver? A: Yes."). In sum, the district court incorrectly found that Ford had not heard all these comments and thus erred in not considering this evidence as part of Ford's claim.

53

With that in mind, we turn to the district court's second reason for dismissal—that Ford had failed to raise a genuine issue of fact that she experienced a severe or pervasive hostile work environment based on race. When viewing the totality of Ford's evidence, including the names she was called and the use of the n-word, we conclude that a reasonable jury could find that Ford experienced a severe or pervasive hostile work environment on account of her race.

The n-word is a "powerfully charged racial term." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1230 (10th Cir. 2015). Its use—even if done with benign intent and undirected at anyone specific—can contribute to a hostile work environment. *See id.* ("The important question is whether the repeated utterance of this term had *the effect* of contributing to the creation of a racially hostile work environment." (emphasis in original)); *see also Savage v. Maryland*, 896 F.3d 260, 277 (4th Cir. 2018) ("[A]n employer's repeated and continuous use of that slur, among others, to insult African–American employees and customers, even when not directed specifically at the complaining employee, is 'sufficiently severe or pervasive (or both)' to create an unlawful hostile work environment." (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001)).

And here, Ford supplied other examples of racist comments beyond just the use of the n-word. For example, she said that after Obama was elected president, her coworkers made jokes about how "Watermelon is going to be on sale," and that "Chevy Impalas will be discounted." Appellant R. vol. 4 at 950. Ford alleges that these "offensive racist and sexist remarks . . . [were] made on a daily basis with

54

impunity." Appellant R. vol. 2 at 467. Indeed, Blanchette even confirmed that Ford had told him that she had gone to "to one of the janitorial broom closets and cried it out" because someone "had made a racially inappropriate comment to her." Appellant R. vol. 3 at 589. Ford also said that she was called "black bitch" several times while working at Jackson. This includes Ford learning from a colleague that Bossert had called her a "Black bitch[] from Atlanta" in a supervisors' meeting while she was still at Jackson.

In *Freeman v. Dal-Tile Corp.*, 750 F.3d 413 (4th Cir. 2014), the Fourth Circuit stated:

> the use of the word "n* * * *r," coupled with the on-going offensive racial talk, use of the term "black b* * * *" on more than one occasion (once directed at a black employee), and sexual talk regarding black women, is sufficient evidence for a reasonable jury to find the race-based harassment was objectively severe or pervasive.

*Id.* at 422. We agree. And many of these same circumstances appear here. Keeping in mind that "the severity and pervasiveness evaluation is particularly unsuited for summary judgment," we therefore conclude that a reasonable jury could find that Ford was subject to a severe or pervasive race-based hostile work environment. *Hernandez*, 684 F.3d at 958 (quoting *O'Shea*, 185 F.3d at 1098).

        c.      <u>Jackson's Response</u>

Before moving on, we consider whether Jackson's response to Ford's complaint absolves it of liability. True, an employer may be absolved of liability "if it undertakes remedial and preventative action reasonably calculated to end the harassment." *Duncan*, 397 F.3d at 1310 (internal quotations and citation omitted).

But, generally, "the promptness and adequacy of the employer's response to a complaint of harassment are fact questions for the jury to resolve." *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 841 (8th Cir. 1998).

Here, Jackson argues that it always "promptly and effectively addressed issues that Ford brought to its attention." Response Br. at 53. To support its argument, Jackson points out that it immediately fired the employees involved in the defaced-football incident, and that Stone investigated Ford's allegations of hostile work environment, permitting her to call him about any complaints.

But in crafting this argument, Jackson ignores Ford's repeated complaints to her superiors about the treatment she was receiving at the company. For example, as stated above, Ford complained to Blanchette and Lane about her treatment. Appellant R. vol. 2 at 468 (Ford stating that she complained to Lane about Walker "ignoring the sexually and racially offensive conduct"); Appellant R. vol. 3 at 589 (Blanchette confirming that Ford had complained to him about racially inappropriate comments made to her). And she articulated these concerns to Stone. *See* Supp R. at 144–47. Despite all this, she alleges that she continued to suffer race- and sex-based harassment, repeatedly raising these allegations in her EEOC complaints. *See* Appellant R. vol. 4 at 950 (Ford alleging that Walker allowed workers to have "openly racist and sexual discussions"); Appellant R. vol. 3 at 741 (Ford alleging that she had "observed sexually explicit and discriminatory e-mails being exchanged").

As another example, Ford first complained about one of the employees involved in the defaced-football incident, Crosby, long before he was fired for that

incident—she specifically mentioned him in her first EEOC complaint back in December 2009. *See* Appellant R. vol. 4 at 950 ("Mr. Crosby has also asked me, 'How big are your boobs?' and 'What size bra do you wear?'"). And she reiterated that he continued to make sexually explicit comments to her in "July or August 2010." Appellant R. vol. 3 at 741 ("Crosby . . . told me . . . that he likes a 'little milk or cream between my chocolate chip cookies,' referring to my breasts."). On these facts, we believe it best for a jury to decide whether Jackson's response was sufficient to absolve it of liability.

In sum, Ford has presented sufficient evidence that she suffered a sex- and race-based hostile work environment. We thus reverse the district court's dismissal of these claims.

## V.    Constructive Discharge

Last, we come to Ford's final claim: constructive discharge. Constructive discharge "occurs when a reasonable person in the employee's position would view her working conditions as intolerable and would feel that she had no other choice but to quit." *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004). A plaintiff's burden on this claim is "substantial." *PVNF*, 487 F.3d at 805. It "entails something more than conduct that amounts to actionable harassment." *Hernandez*, 684 F.3d at 961 (brackets omitted) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)). Instead, it asks "whether the employee had any other reasonable choice but to resign in light of [the employer's] actions." *Tran*, 355 F.3d at 1270.

The district court dismissed this claim because it found that Ford "had failed to raise a genuine issue of fact that she was subject to a hostile work environment." R. vol. 4 at 938. So, according to the court, Ford could not "sustain the more onerous burden" of proving a claim for constructive discharge. *Id.* In other words, the district court's dismissal of Ford's constructive-discharge claim was premised solely on its finding that Ford had not proven her claim for hostile work environment.

But because we reverse the dismissal of Ford's hostile-work-environment claim, we also reverse the dismissal of Ford's constructive-discharge claim. This will allow the district court to consider, in the first instance, whether Ford has submitted sufficient evidence of her claim of constructive discharge.

## VI.    The District Court's Application of Its Procedural Rules

Ford also argues that the district court improperly applied its own procedural rules, which resulted in the court erroneously granting summary judgment for Jackson. We review how a district court applied its local rules for abuse of discretion. *Roth v. Green*, 466 F.3d 1179, 1190 (10th Cir. 2006).

Ford argues that Jackson failed to adhere to the district court's practice standards. At issue is the requirement that a litigant, on a motion for summary judgment, respond to the other party's disputed facts by providing a brief explanation for its position and citing the record.[15]

---

[15] Ford also points out that Jackson submitted several single-spaced filings, which would violate the district court's local rules, and that Jackson's motion for summary judgment was unsigned.

58

But the district court noted Jackson's flouting of its procedures in its order. *See* Appellant R. vol. 4 at 905 n.2. That the court still decided to consider Jackson's motion was not an abuse of discretion given "the wide latitude district courts enjoy in interpreting and administering their own rules." *Bylin v. Billings*, 568 F.3d 1224, 1230 n.7 (10th Cir. 2009). And though Ford argues that she was prejudiced because Jackson's noncompliance prevented the court from understanding which facts were disputed, *see* **Opening Br. at 50,** the court did not indicate that it faced such a problem.

In sum, the district court did not abuse its discretion in how it applied its local and procedural rules.

## CONCLUSION

For these reasons, we affirm the dismissal of Ford's discrimination claim. But we reverse the dismissal of her retaliation claim (only on her failure-to-promote theory) and her hostile-work-environment claim. We also reverse and remand her constructive-discharge claim.